IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA,　　　　)
　　　　　　　　　　　　　　　　　)
　　　　　　　　Plaintiff,　　　　)
　　　　　　　　　　　　　　　　　)
　　　　v.　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　)
PARAMOUNT PICTURES, INC.,　　　　)
　　　　　　　　　　　　　　　　　)
　　　　　　　　Defendant.　　　　)
_____)
　　　　　　　　　　　　　　　　　)
UNITED STATES OF AMERICA,　　　　)
　　　　　　　　　　　　　　　　　)
　　　　　　　　Plaintiff,　　　　)
　　　　　　　　　　　　　　　　　)
　　　　v.　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　)
LOEW'S INCORPORATED, ET AL.,　　　)
　　　　　　　　　　　　　　　　　)
　　　　　　　　Defendants.　　　　)
_____)

**MEMORANDUM IN SUPPORT OF MOTION OF THE UNITED STATES
FOR AN ORDER TERMINATING ANTITRUST JUDGMENTS**

The United States respectfully submits this memorandum in support of its motion to

terminate the consent decrees collectively known as the "*Paramount* Decrees."[1]  The *Paramount*

_____

[1] *See United States v. Paramount Pictures, Inc.*, Equity No. 87-273, 1948-49 Trade Cas. (CCH) ¶ 62,377 (S.D.N.Y. Mar. 3, 1949) (Paramount Pictures, Inc.); 1950-51 Trade Cas. (CCH) ¶ 62,861 (S.D.N.Y. June 7, 1951) (Twentieth Century Fox Film Corp. ("Fox")); 1950-51 Trade Cas. (CCH) ¶ 62,573 (S.D.N.Y. Feb. 8, 1950) (Columbia Pictures Corp., Universal Corp., and United Artists Corp.); 1950-51 Trade Cas. (CCH) ¶ 62,765 (S.D.N.Y. Jan. 4, 1951) (Warner Brothers Pictures, Inc.); and 1952-53 Trade Cas. (CCH) ¶ 67,228 (S.D.N.Y. Feb. 7, 1952) (Loew's Incorporated).   Copies of these Final Consent Judgments are attached as Appendix A.   As discussed below, the

Decrees successfully dismantled and ended the motion picture horizontal distributor cartel of the 1930s and 40s and have regulated aspects of the motion picture industry for the last seventy years. The Decrees prohibit some of the *Paramount* Defendants from acquiring movie theatres without approval pursuant to the Decrees, and bar each Defendant from engaging in certain film licensing practices.

The United States moves to terminate these Decrees immediately, except for a two-year sunset period on the Decrees' provisions banning block booking and circuit dealing.[2]  This sunset period would allow the Defendants and their movie theatre licensees a transition period to adjust to any film licensing proposals that would replace the Decrees' required theatre-by-theatre, film-by-film licensing structure.   Attached as Appendix B is a Proposed Order Terminating Final Judgments.

## I.      Introduction

Over seventy years ago, this Court, at the request of the United States, entered the *Paramount* Decrees to restore competition in the motion picture industry– an industry in which eight major motion picture distributors had conspired and colluded during the 1930s and 40s in an

---

decrees at issue involve identical legal and factual issues and arise from the same underlying case.   Accordingly, the United States submits that, in the interest of judicial economy, termination of these decrees should be addressed simultaneously.   *See United States v. Eastman Kodak Co.*, 63 F.3d 95, 97-100 (2d Cir. 1995) (terminating separate Kodak decrees with one order).

[2]  The Supreme Court defined block booking as "the practice of licensing . . . one feature or a group of features on condition that the exhibitor will also license another feature or group of features."   *Paramount*, 334 U.S. at 156.   In essence, "tying" multiple films together in one theatrical license, instead of licensing films on a film-by-film basis. Circuit dealing is the practice of licensing films to all movie theatres under common ownership, as opposed to licensing each film on a theatre-by-theatre basis.   *Id*. at 153-57.   The Decrees' provisions relating to block booking and circuit dealing are set forth in each Decree in Section II, Paragraphs 6, 7, and 8, except for the Warner Decree; and Section III, Paragraphs 6, 7, and 8 of the Warner Decree.

attempt to monopolize the first-run film distribution and movie exhibition markets.  *See United States v. Paramount Pictures, Inc.*, 66 F. Supp. 323 (S.D.N.Y. 1946); *modified on recharging*, 70 F. Supp. 53 (S.D.N.Y. 1947); *aff'd in part and rev'd in part*, 334 U.S. 131 (1948), *on remand*, 85 F. Supp. 881 (S.D.N.Y. 1949), *aff'd*, 339 U.S. 974 (1950).[3]  The Paramount Decrees initially covered eight major movie distributors and the five movie theatre companies that were created as a result of the Decrees' divestiture provisions.   Several of these Defendants no longer exist, including all five movie theatre Defendants.   Today, the *Paramount* Decrees continue to regulate only seven Defendants – Paramount, Fox, Universal, Columbia, Warner Bros, Metro-Goldwyn-Mayer, Inc. ("MGM"),[4] and United Artists – that still distribute and license motion pictures to movie theatres; they do not apply to any other motion picture distributors or movie theatres.

For purposes of this motion, the question is whether the antitrust violations that the Decrees remedied would reoccur if the Decrees are terminated.   There is no reason to believe that Defendants would or could re-establish the industry-wide horizontal conspiracy or cartel that was the basis for the original enforcement action by the United States and the resulting Decrees.   Such a conspiracy or cartel is particularly unlikely and improbable today because of the technological and marketplace changes that have transformed the movie industry over the last seventy years.   Additionally, since the motion picture industry has always remained fully subject

---

[3] Copies of the judicial decisions justifying the entry of the *Paramount* Decrees are attached as Appendix C.

[4] At the time that the *Paramount* Decrees were entered, Loew's Inc. was a major motion picture company.   It produced and distributed films; and it owned 135 first-run theatres.   *Paramount,* 334 U.S. at 167, fn. 18.   Pursuant to the *Paramount* Decree, Loew's Inc. spun off its 135 theatres to a new, independent company, Loew's Theatres, Inc. ("Loew's Theatres").   Loew's Inc. then changed its name to MGM and continued to produce and distribute motion pictures.

to the antitrust laws, any recurrence of the anticompetitive collusion that the Decrees enjoined would be prohibited under existing law.   For these reasons, the United States has concluded that there is no need to subject the remaining Defendants to decrees which regulate some, but not all, motion picture distributors.

In 2018, the Antitrust Division announced an initiative to review, and where appropriate, to terminate or modify "legacy antitrust judgments that no longer protect competition" because of "changes in industry conditions, changes in economics, changes in law, or for other reasons."[5] Almost all of the legacy judgments, like the *Paramount* Decrees, are permanent.   That is, they have no termination date.[6]   To date, over seventy districts have terminated legacy judgments upon similar motions.[7]   As part of the 2018 initiative, the Division undertook a thorough review and analysis of the remaining *Paramount* Decrees.

The Division's review of the *Paramount* Decrees included a 60-day notice and public

---

[5]  *See* U.S. Department of Justice Press Release, *Department of Justice Announces Initiative to Terminate "Legacy" Antitrust Judgments* (April 25, 2018) (attached as Appendix D).

[6]  In 1979, the Division started to include a "sunset provision" in every consent decree that, with rare exception, would result in the decree's automatic termination after ten years or fewer.   This change in policy followed Congress' 1974 amendments to the Sherman Act that made violations a felony, punishable by enhanced fines and jail sentences.   Given the increased penalties that Congress has mandated for *per se* violations of the antitrust laws, the Division concluded that a successful criminal prosecution under the Sherman Act more effectively deterred antitrust recidivists than a criminal contempt proceeding under provisions of an old consent decree.   *See United States v. Columbia Artists Mgmt., Inc.*, 662 F. Supp. 865, 867 (S.D.N.Y. 1987).   Consequently, the only antitrust decrees to which the United States is a party that remain in effect today are those entered within the past ten years, or legacy judgments, like the *Paramount* Decrees, that were entered into before 1979.

[7]  The courts span all judicial districts and include other courts within this Circuit.   *See, e.g., United States v. A. Schrader's Son, Inc., et al.*, Case No. 1:19-mc-01438-PKC (E.D.N.Y. Jun. 24, 2019) (terminating fourteen judgments); *United States v. Alden Paper Co., et al.*, Case No. 1:19-mc-00015-DNH (N.D.N.Y. Apr. 29, 2019) (terminating five judgments); *United States v. New Departure Manufacturing Co., et al.*, Case. No. 1:19-mc-00016-LJV (W.D.N.Y. Jun. 11, 2019) (terminating twelve judgments); *United States v. County National Bank of Bennington, et al.*, Case No. 5:19-mc-00032-gwc (D. Vt. Mar. 21, 2019) (terminating one judgment).

comment period.   The Division received over eighty comments.[8]   Although many of those comments argue that some or all of the licensing restraints contained in the Decrees should be maintained, not one comment identifies any ground to conclude that – absent the Decrees – Defendants would collude to re-impose uniform distribution and licensing schemes on movie theatres.   Under Second Circuit law, that is the key question for this motion.   *See United States v. International Business Machines Corp.*, 163 F.3d 737 (2d Cir. 1998) (affirming order to terminate consent decree because the antitrust violations underlying the decree were unlikely to reoccur).

In fact, absent an illegal horizontal agreement among Defendants to do so, the licensing restraints that the *Paramount* Decrees currently prohibit are not, by themselves, *per se* illegal under current antitrust law.   Indeed, contrary to the assertions in several of the public comments, those prohibited licensing practices may be efficient, and thus, if allowed, beneficial to competition and consumers.

Numerous commenters argue that removing the Decrees' *per se* ban on block booking and circuit dealing would end the theatre-by-theatre, film-by-film licensing structure that the Decrees mandate, and enhance each individual Defendant's bargaining power in its separate negotiations with theatres and theatre circuits.[9]   As set forth below, the United States believes that changes in the motion picture industry, antitrust jurisprudence, and economic understandings, warrant

---

[8] The Division publicly posted submitted public comments and they can be found at: *https://www.justice.gov/atr/paramount-consent-decree-review-public-comments-2018*.

[9] *See, e.g.*, comments from the National Association of Theatre Owners ("NATO") and the Independent Cinema Alliance ("ICA").

immediate termination of the Decrees' *per se* ban on block booking and circuit dealing.   Given commenters' concerns, however, the United States proposes to add a two-year sunset period to the Decrees' block booking and circuit dealing provisions, which would provide a transition period to minimize market disruption and allow all parties to adjust their business plans accordingly.[10]

## II.   Background

### A.   The Motion Picture Industry in the 1930s and 40s

Between 1911 (when D.W. Griffith released the first multi-reel feature film) and 1938 (when the United States filed the *Paramount* case), eight companies – Paramount, Fox, Warner Bros, Loew's, Radio-Keith-Orpheum ("RKO"),[11]  Universal, Columbia, and United Artists (collectively the "*Paramount* Defendants") dominated the production and distribution of motion pictures in the United States.   As set forth in the table below, these companies fell into two groups:   those that produced, distributed and exhibited movies; and those that produced and/or distributed movies, but did not exhibit movies.

| Company | Production | Distribution | Exhibition |
|---|---|---|---|
| Paramount | X | X | X |
| Fox | X | X | X |
| Warner Bros | X | X | X |
| Loew's | X | X | X |

---

[10] For the reasons discussed below, the United States believes that the Decrees' other provisions can be terminated immediately.

[11] RKO dissolved in 1959.   Because RKO no longer exists, the RKO *Paramount* Decree, a copy of which is attached as Appendix E, serves no purpose.   *See United States v. Paramount Pictures, Inc.*, Equity No. 87-273, 1949 Trade Cas. (CCH) ¶ 62,335 (S.D.N.Y. Nov. 8, 1948).   For that reason, the United States respectfully requests that the Court terminate that decree.

| RKO | X | X | X |
|---|---|---|---|
| Universal | X | X | |
| Columbia | X | X | |
| United Artists | | X | |

*See Paramount,* 334 U.S. at 140.

The *Paramount* Defendants accounted for most of the first-run motion pictures distributed in the United States at that time, including over 95 percent of class A feature films – the higher-grade, highly-publicized films shown in the "leading" motion picture theatres. *See* Michael Conant, *Antitrust in the Motion Picture Industry* at 44 (University of Cal. Press 1960).

Five of the *Paramount* Defendants, Paramount, Loew's, Warner Bros, RKO and Fox (collectively, the "major Defendants"), owned large movie theatre circuits, including over 70 percent of the best and largest "first-run" theatres in the 92 largest cities in the United States. *Paramount,* 334 U.S. at 167.

This market structure eventually led to cooperation and collusion, establishing a cartel among the *Paramount* Defendants for the purpose of (1) limiting the first run of their pictures, as much as possible, to the theatres that the major Defendants owned and controlled; and (2) closing off first-run theatres to their competitors, independent motion picture distributors.

To facilitate their illegal conspiracy, the Defendants agreed to adopt intricate and uniform film licensing and distribution practices.   First, the major Defendants agreed that their films would receive preferential treatment and guaranteed play dates in each other's owned and operated first-run movie theatres.   *See Paramount*, 70 F. Supp. at 61 (film licenses evidenced the "inter-relationship among the defendants"); 85 F. Supp. at 889-90; Conant, *supra*, *Antitrust in the*

*Motion Picture Industry* at 52.   Although Universal, Columbia and United Artists did not own

any theatres, they each joined this scheme.   *Id.*   For example, in Chicago, where Paramount

dominated the first-run movie theatre market, the other Defendants agreed to release their films

exclusively in Paramount's theatres.   *Id.* at 155.   In return, Paramount agreed to release its films

exclusively in the other major Defendants' first-run theatres located in other cities.   *Id.*   In

areas, where more than one Defendant had first-run theatres, Defendants entered into pooling

agreements among themselves (and also with independent theatre circuits in certain markets) to

operate the first-run theatres in those markets "collectively, rather than competitively."[12]

*Paramount,* 66 F. Supp. at 351.   Because many of these owned, controlled and pooled first-run

theatres were located in strategic metropolitan areas, the pervasive web of cross licenses and

pooling agreements allowed the major Defendants to control access to the first-run theatre market.

      Second, to further ensure that their films would play in the major Defendants' owned and

controlled theatres, the *Paramount* Defendants created and agreed to an intricate system of

sequential and non-overlapping theatrical "runs" for their films.   Pursuant to that scheme, the

Defendants classified all movie theatres into specific "run" categories.   The first run was

exclusively to what were then called first-run theatres.   This was the highest priced and most

---

[12]  The major Defendants owned 3,137 theatres in 1945.   *Paramount,* 70 F. Supp. at 67; Conant, *Antitrust in the Motion Picture Industry*, at 48-55.   Additionally, through joint ownership and pooling agreements with third parties, the major Defendants controlled an additional 1,287 theatres.   *Id.*   Unlike today's multi-screen multiplex theatres, most theatres in the 1930s and 40s had only one screen.   At the time this Court entered the Decrees, the major Defendants owned and controlled about 4,400 screens.   By comparison, today there are more than 40,000 movie screens in the United States – and no Defendant owns a significant number of them.   *See, e.g.*, data from the National Association of Theatre Owners, http://www.natoonline.org (showing in 2018 more than 40,000 movie screens in 5,500 theatres in the United States).

profitable "run" because most movie goers saw movies within a few weeks of release.   Not surprisingly, the Defendants agreed to designate almost all of the theatres that the major Defendants owned and controlled as first-run.    After the first run ended, the Defendants distributed their movies to discount-priced theaters in the second-run market, and after the second run, to a more-discounted third, fourth, or later theatrical run.   *Paramount,* 334 U.S. at 144, fn. 6. The Defendants agreed to relegate most independent theatres to the later less profitable runs.

Third, Defendants agreed to a system of clearances – or set time periods between sequential theatrical runs – to protect or insulate a particular run of a film from competition from subsequent runs.   *Id*.   Long clearance periods channeled consumers to the higher priced first-run theatres that the major Defendants owned or controlled, thus weakening the demand for a film's subsequent runs at independent theatres.   The clearance system further ensured that Defendants' films initially would screen at the high-priced major Defendants' theatres – unencumbered by competition from independent theatres.

Finally, the Defendants agreed on minimum ticket prices for first and subsequent-run theatres to ensure that the theatres in different runs would not price compete.

The cross-licensing, pooling agreements, sequential run and clearance system, and minimum ticket prices that all of the *Paramount* Defendants illegally agreed to limited and restrained competition between movie distributors, as well as theatres in the same geographic area.   *Paramount,* 66 F. Supp. at 334, 340; 85 F. Supp. at 886.   As a result of this conspiracy, the five major Defendants controlled 70 percent of national box office receipts, *Paramount*, 334 U.S. at 167, and "from 1935 to 1940 the *Paramount* Defendants collectively received 95 percent

of domestic film rentals."   Conant, *supra*, *Antitrust in the Motion Picture Industry,* at 44-46.

**B.      Complaint and the Paramount Litigation**

In 1938, the United States filed an antitrust suit against the *Paramount* Defendants,

alleging violations of Sections 1 and 2 of the Sherman Act.   *United States v. Paramount*

*Pictures, Inc., et al.*, Equity No. 87-273 (S.D.N.Y.).   The complaint charged the eight defendants

"with combining and conspiring unreasonably to restrain trade and commerce in the production,

distribution, and exhibition of motion pictures and to monopolize such trade and commerce in

violation of the Sherman Act."   *Paramount,* 66 F. Supp. at 330.

A trial commenced in this Court before a three-judge panel.   This Court found that

Defendants through illegal horizontal collusion and a cartel had (1) monopoly power in the

distribution market for first-run motion pictures; and (2) engaged in a conspiracy to fix licensing

practices, including admission prices, run categories, and clearances for substantially all theatres

located in the United States.   *Paramount,* 334 U.S. at 170-71; 85 F. Supp. at 884, 896 ("we have

found that a conspiracy has been maintained through price fixing, runs and clearances, induced by

vertical integration" and resulting "in the exercise of monopoly power").   The result of this

collusion was to restrain competition in the first-run motion picture distribution and theatre

markets in most of the larger cities of the country in violation of the Sherman Act.

The Supreme Court affirmed this Court's finding that Defendants were liable under the

Sherman Act.   *Paramount*, 334 U.S. at 141-61.   The Court, however, remanded the matter on

the question of an adequate remedy and instructed this Court to fashion relief that would "uproot

all parts of [the] illegal scheme – the valid as well as the invalid – in order to rid the trade or

commerce of all taint of the conspiracy" and undo "what the conspiracy achieved." *Id*. at 148, 171.

### C.     The *Paramount* Decrees

Ultimately, the United States and each Defendant entered into separate decrees to remedy the competitive harms.   Initially, and before any further hearings, RKO and Paramount consented to decrees.   With respect to the other Defendants, this Court held a contested remedy hearing.   It then issued a final decision, and entered into the additional decrees: (1) against each of the three major Defendants that had contested theatre divestiture (Warner Bros, Fox and Loew's); and (2) collectively, against the minor Defendants (Universal, Columbia and United Artists).

The *Paramount* Decrees required the major Defendants to divest their theatres to new independent companies.   For the major Defendants, the decree applied equally to the distribution companies and the new companies set up to own and operate each of their movie theatre circuits.[13]   The Warner Bros, Fox and Loew's Decrees also prohibited their distribution companies from acquiring any theatres unless this Court found that such acquisitions would not unreasonably restrain competition.   Because they were entered earlier, the RKO and Paramount Decrees did not contain that restriction – RKO and Paramount, like Universal, Columbia and

---

[13]  The new theatre companies that RKO, Fox, Warner, and Paramount established pursuant to the Decrees no longer exist.  *See generally* Note, *An Experiment in Preventive Anti-Trust: Judicial Regulation of the Motion Picture Exhibition Market Under the Paramount Decrees,* 74 Yale L.J. 1041 (1965) (arguing that the *Paramount* Decrees inhibited Defendant theatre companies from competing in and adapting to changing exhibition markets).   As set forth below, this Court terminated the Loew's Theatre Decree in 1992.   Consequently, the *Paramount* Decrees that are subject to this motion only apply to and regulate the remaining film distribution Defendants – Paramount, Fox, Universal, Columbia, MGM, United Artists, and Warner Bros – not any theatre companies.

United Artists, have always been free to acquire theatres without court approval.

In addition to the theatre divestiture requirements, the Decrees restricted the ways in which all the Defendants could license and distribute movies to theatres. Specifically, the Decrees barred each Defendant from engaging in the following practices:

- Resale price maintenance – setting minimum movie ticket prices; (Section II, Paragraph 1 and Section III, Paragraph 1 of the Warner Decree);

- Unreasonable clearances – granting exclusive film licenses for overly broad geographic areas (Section II, Paragraphs 2, 3, and 4 and Section III, Paragraphs 2, 3, and 4 of the Warner Decree);

- Block booking – bundling multiple films in one theatrical license (Section II, Paragraph 7 and Section III, Paragraph 7 of the Warner Decree); and

- Circuit dealing – licensing a film to all theatres under common ownership or control instead of theatre by theatre (Section II, Paragraphs 6 and 8 and Section III, Paragraphs 6 and 8 of the Warner Decree).

The Decrees ended the movie distributor cartel of the 1930s and 40s.   *United States v. Paramount Pictures, Inc.*, 1980-82 Trade Cas. ¶ 63,533 at 76,951 (S.D.N.Y. 1980).   *See also Buckhead Theatre v. Atlanta Enterprises*, 327 F.2d 365 (5th Cir. 1964) (*Paramount* Decrees inadmissible to support alleged motion picture conspiracy beginning in 1952); *cf. Theatre Enterprises, Inc. v. Paramount Film Distributing Corp.*, 346 U.S. 537, 543-44 (1954) (The *Paramount* conspiracy "was enjoined no later than June 25, 1948," the alleged motion picture conspiracy here ran from February 1949).

### D.    This Court Previously Terminated a *Paramount* Decree

As stated above, this Court previously terminated a *Paramount* Decree that applied to a now-defunct defendant movie theatre company.   In 1992, Loew's Theatres, Inc. moved to

12

terminate its *Paramount* Decree.[14]   With respect to its movie theatre business, Loew's Theatres argued, among other things, that the Decree's restrictions made it difficult to compete against other movie theatre circuits that were not subject to the Decrees.   With the United States' consent, this Court terminated the Decree as it applied to Loew's Theatres.   See *United States v. Loew's Inc.*, 783 F. Supp. 211 (S.D.N.Y. 1992).   In support of Loew's motion, the United States noted that:

- Existing antitrust law prohibits the anticompetitive conduct that the Loew's Decree enjoined;

- The Decree created an uneven and unfair playing field by restricting Loew's Theatres' ability to compete against other large theatre circuits that were not subject to the Decree; and

- In the 40 years since the court entered the Loew's Decree, the motion picture industry had undergone "great changes," including the use of wide film release patterns rather than a series of runs, multiplex theatres replacing one-screen theatres, and new forms of post-theatrical exhibition, such as videocassettes and cable television, that rendered the Decree obsolete.

This Court recognized that "the Department of Justice has broad discretion in controlling government antitrust litigation," and found the arguments set forth above to be a "reasonable and persuasive explanation" of why termination of the Loew's Decree "would serve the public interest in free and unfettered competition."   *Id.*   Consequently, this Court terminated that Decree, finding that "there is no persuasive reason for maintaining the Judgment and subjecting Loew's to restrictions that do not bind other exhibition circuits."   *Id.* at 215.

---

[14]  In 1992, Loew's Theatres, but not MGM, successfully moved to terminate the Decree.   The Decree still applies to MGM and is part of this motion.

As set forth below, these same arguments support this motion to terminate the remaining *Paramount* Decrees.

### III.   Legal Standards for Termination of Consent Decrees

The *Paramount* Decrees envision possible termination:   Each of the Decrees provides that this Court retains jurisdiction to enable "any of the parties . . . and no others, to apply for any such further order . . . as may be necessary or appropriate for . . . the construction, modification . . . or for other or further relief."   *See, e.g.*, Loew's Inc. Decree 1952-53 Trade Cas. (CCH) ¶ 67,228 (S.D.N.Y. Feb. 7, 1952) at Section X (*See* Appendix A).   This Court previously has found that it has jurisdiction "to modify or terminate" the Decrees.   *Loew's*, 783 F. Supp. at 213.

Under Rules 60(b)(5) and (6) of the Federal Rules of Civil Procedure, on "motion and just terms, the court may relieve a party from a final judgment [when] applying it prospectively is no longer equitable; or any other reason that justifies relief."[15]   *See IBM*, 163 F.3d 737.

Where, as here, the United States seeks to terminate an antitrust judgment, the court, exercising judicial supervision, should approve a decree termination where the United States has provided a reasonable explanation to support the conclusion that termination is consistent with the public interest.   *IBM*, 163 F.3d at 740; *American Cyanamid*, 719 F.2d at 565; *Loew's*, 783 F.

---

[15]  Although the Tunney Act governs the procedures for *judicial approval* of consent decrees filed by the Antitrust Division, by its terms, it is not applicable to consent decree termination proceedings.   Nevertheless, the Second Circuit has held that the Tunney Act can provide "useful guidance" to the court with respect to decree terminations. *See United States v. American Cyanamid Co.,* 719 F.2d 558, 565 n.7 (2d Cir. 1983).   The Tunney Act does not require a court to conduct an evidentiary hearing, 15 U.S.C. § 16(e)(2).   As described in this memorandum, in light of the seventy years that have passed since this Court entered the *Paramount* Decrees, the fact that the Decrees ended the movie distributor cartel, and the changed factual and legal circumstances as a result of and since their entry, the United States does not believe that it is necessary for this Court to make an extensive inquiry into the facts of these Decrees in order to terminate them under Fed. R. Civ. P. 60(b)(5) or (b)(6).

Supp. at 213-14; *Columbia Artists Mgmt., Inc.*, 662 F. Supp. at 869-70.   *See also United States v. Western Elec. Co.*, 900 F.2d 283, 307 (D.C. Cir. 1990) (a court should approve a termination "so long as the resulting array of rights and obligations is within the zone of settlements consonant with the public interest today"); *United States v. Western Elec. Co.*, 993 F.2d 1572, 1576-77 (D.C. Cir. 1993) (under "deferential" public interest test, a court should accept a consensual termination of decree restrictions that the United States "reasonably regarded as advancing the public interest;" it is "not up to the court to reject an agreed-on change simply because the proposal diverge[s] from its view of the public interest;" rather, a court "may reject an uncontested termination only if it has exceptional confidence that adverse antitrust consequences will result.").

This Court's "public interest determination must be based on the same analysis that it would use to evaluate the underlying violation" – whether the present marketplace "is such" that the antitrust violation alleged in the complaint would reoccur following the decree's termination. *IBM*, 163 F.3d at 740.   That evaluation necessarily is "forward-looking and probabilistic . . . focused on the *likelihood* of a potential future violation, rather than the *mere possibility* of a violation."   *Id*. at 742 (emphasis added).   In that regard, if the government reasonably explains why there is "no current need for" a decree, termination would serve "the public interest . . . ." *Loew's*, 783 F. Supp. at 213-14 (quoting *N. Pac. Ry. Co.* v. *United States*, 356 U.S. 1, 4 (1958)).

For example, in *IBM*, the Second Circuit considered IBM's motion to terminate a consent decree, which the United States joined, that was designed to prevent IBM from unilaterally engaging in illegal tying arrangements.   The threshold question was: "[H]ow likely it is that the defendant will thereafter engage in the actual tying of the relevant products following termination

15

of the Decree." *IBM*, 163 F.3d at 741.   To answer that question, the Second Circuit evaluated the elements of a tying claim, *id.*, and concluded that the market had changed so significantly since the decree was entered that IBM was "unlikely" in the future to reengage in illegal tying. *Id.* at 742.   In other words, if the reoccurrence of the antitrust claim underlying the decree is unlikely – in IBM's case unilateral conduct, here a market-wide illegal conspiracy – termination of the decree is in the public interest.

## IV.   Reasons Why This Court Should Terminate the *Paramount* Decrees

The Antitrust Division has concluded that terminating the *Paramount* Decrees would be in the public interest.   First, the Decrees long ago achieved the Supreme Court's remedial mandate to this Court:   The Decrees "uprooted" and ended the Defendants' illegal conspiracy and, along with the passage of time, "rid" the industry of "all taint of the conspiracy," undoing "what the conspiracy achieved."   *Paramount*, 334 U.S. at 148, 171.   Second, significant changes in the motion picture industry over the last seventy years have made it unlikely that the remaining Defendants could or would reinstate their cartel to monopolize the motion picture distribution and theatre markets.[16]   Third, since the Court entered the Decrees, antitrust case law has evolved to undermine the Decrees' ongoing regulatory provisions.   Although the Decrees bar vertical licensing practices as *per se* illegal, under current Supreme Court precedent, a court today would judge that same conduct pursuant to the fact-specific rule of reason.   Indeed, as discussed in

---

[16] This Court recognized that fact almost forty years ago.   *See United States v. Paramount Pictures*, Inc., Equity No. 87-273, 1980 U.S. Dist. LEXIS 13427, at *8 (S.D.N.Y. 1980) ("since the original *Paramount* decrees, the motion picture industry has changed considerably").

more detail below, certain vertical restrictions can be benign or even beneficial to competition.

Finally, the Defendants remain subject to liability under the antitrust laws.   Absent the Decrees,

the Sherman Act would continue to provide effective deterrence against any industry-wide

attempts to reestablish a cartel to monopolize the film distribution and exhibition markets.

### A.      After Seventy Years, the *Paramount* Decrees Are No Longer Necessary

The gravamen of the *Paramount* case was a long-standing horizontal conspiracy among

the *Paramount* Defendants to monopolize the first-run motion picture theatre markets.   Crucial

to this illegal cartel was that (1) Defendants collectively had monopoly power in the distribution

market for first-run films; and (2) the major Defendants also owned the best "first-run" theatres in

the most important geographic locations.[17]   This market structure led to collusion that foreclosed

independent distributors from sufficient access to the first-run theatre market.   Conant, *supra*,

*Antitrust in the Motion Picture Industry* at 47 (defendants' control over "key theatres gave them

the power to exclude other distributors from a large share of the exhibition market").   The

market structure also facilitated other illegal agreements that foreclosed non-affiliated theatres

from exhibiting Defendants' films during their first run.   *Id*. at 204 ("the run and clearance

patterns adopted by all distributors . . . resulted in the five majors taking the largest part of their

monopoly profits at that level").

The *Paramount* case put an end to the Defendants' collusion and cartel and, in their

---

[17] By monopolizing the one-screen theatres in key cities and making their films exclusive to those theatres, Defendants collectively foreclosed competition in both the movie distribution and exhibition markets.   *Paramount*, 85 F. Supp. at 893-94 (the conspiracy "was powerfully aided" by the five major Defendants "ownership of . . . the best first-run theatres" coupled with Defendants' possession of the "best pictures").

absence, the market long-ago reset to competitive conditions.   Both the market structure and

distribution system that facilitated that collusion no longer exist.   In addition, seventy-years of

technological innovations, new competitors and business models, and shifting consumer demand

have fundamentally changed the industry.   As this Court previously stated in granting a motion

to terminate an antitrust judgement: "In view of the changed environment in which the Final

Judgment now operates, there is no persuasive reason for maintaining it and imposing upon the

defendants a decree which no longer comports with the current state of the market." *Columbia*

*Artists Mgmt.,* 662 F. Supp. at 870.

### 1.   Defendants no longer own a significant number of theatres

Because the decrees forced the major Defendants to separate their distribution and theatre

operations, today none of them owns an appreciable percentage of the nation's movie theatres.

Indeed, no movie distributor is a major theatre owner.   This is a key structural fact of today's

marketplace:   the crux that facilitated the 1930's and 40s motion picture cartel's long-running

scheme to monopolize the theatre market does not exist, and it has not existed for over seventy

years.

### 2.   Films today are broadly released in single theatrical runs

The distribution of motion pictures also has changed dramatically.   In the 1930s and 40s,

the only way that the public could view a motion picture was in a single-screen movie theatre –

multiplexes, broadcast and cable television, the Internet, and DVDs did not exist.   The single-

screen, theatre-only distribution market provided the *Paramount* Defendants with the incentive

and ability to limit the first-run distribution of their films to a select group of owned or controlled

theatres in order to maximize their profits, and to relegate independent theatres to subsequent less profitable runs.

Today, none of the Defendants use sequential theatrical runs and clearances to separate first-run and subsequent-run theatres primarily because subsequent theatrical runs, as well as subsequent-run theatres, no longer exist in any meaningful way.   Rather, major films are released broadly to thousands of multi-screen theatres at the same time in a single theatrical run. This material change in film distribution was apparent in 1989, when the Second Circuit explained:

> [T]he development of national television advertising [has] changed the business realities of the industry so that movie producers and distributors have every incentive to disseminate their products as quickly, and as widely, as possible.   Many more exhibitors exhibit on many more screens than was the case when the consent judgments were entered into.

*United States v. Loew's Inc.*, 882 F.2d 29, 33 (2d Cir. 1989); Th*eee Movies of Tarzana*, 828 F.2d 1395 at 1397 (9th Cir. 1987) ("nationwide trend" to release movies broadly to theatres for single, shorter theatrical runs).

Once their single theatrical run ends, films are distributed to various non-theatrical aftermarkets that did not exist in the 1940s – Internet streaming, Internet downloads, pay and broadcast television, and DVDs.   *Id.*; *Loew's,* 882 F.2d at 33.   The *Paramount* Decrees do not apply to any of these aftermarkets.   Movie distributors can and do earn significant revenues from these post-theatrical markets, and these markets have become more important.   Success in the theatrical market can and do translate into higher post-theatrical revenues thereby providing the "incentives" for broad theatrical distribution that the Second Circuit recognized thirty years ago.

*Loew's*, 882 F.2d at 33.

Moreover, as Internet movie streaming services proliferate, film distributors have become less reliant on theatrical distribution.   *See* Brook Barnes, <u>The Streaming Era Has Finally Arrived.</u> <u>Everything Is About to Change</u>**,** *N.Y. Times*, Nov. 18, 2019 (discussing the advent and rise of Internet movie streaming services).   For example, some independent distributors, relying on subscription, instead of box office, revenues, currently release movies to theatres with either limited theatrical runs or on the same day as Internet movie streaming services.   Netflix, which plans to release over fifty movies this year, "mostly bypasses theatres."   Brooks Barnes, <u>Netflix's Movie Blitz Takes Aim at Hollywood's Heart</u>, *N.Y. Times*, Dec. 16, 2018.   "To qualify for awards, a handful of Netflix movies appear simultaneously online and in art theatres in New York and Los Angeles."   *Id.   Roma*, a Netflix film and an Oscar best picture nominee, had an initial theatrical run "only for one to three weeks."   *Id.*

Given this changed and changing marketplace, if this Court terminated the Decrees, it is unlikely that the remaining Paramount Defendants would collude to once again limit their film distribution to a select group of theatres.   Indeed, it would make no economic sense.

### 3.      The competitors have changed

The last seventy years also has seen significant changes in the competitive landscape of the motion picture industry.   Many of the original defendants are no longer in business, including the RKO film distribution company, and all of the Loew's, Paramount, RKO, Warner Bros, and Fox theatre companies that were created as a result of the decrees' divestiture provisions.   Other defendants also distribute far fewer films.   For example, MGM, one of the

largest movie studios in the 1930s and 40s, distributed 52 movies in 1939, including *Gone with the Wind, The Wizard of Oz,* and *It's a Wonderful Life*; it distributed just three movies in 2018. Another defendant, United Artists, now owned by MGM, distributed 30 movies in 1939, including *Stagecoach, Wuthering Heights,* and *Of Mice and Men*; it did not distribute a single movie in 2018.

Motion picture distributors that are not subject to the Decrees have entered the market since the 1940s – most significantly, The Walt Disney Company, the leading motion picture distributor in 2018 with about $3 billion in domestic box office revenues.[18]   Other motion picture distributors not subject to the Decrees include Lionsgate (20 films released in 2018), STX Entertainment (10 films), Focus Features (13 films), and Roadside Attractions (12 films).[19] Moreover, none of the Internet streaming companies – Netflix, Amazon, Apple and others – that produce and distribute movies are subject to the Decrees.   Thus, the remaining *Paramount* Defendants are subject to legal constraints that do not apply to other movie distributors.

Finally, the fact that movie distributors that are not subject to the Decrees have shown no propensity to acquire major movie theatre circuits or to engage in the type of collusive practices that the *Paramount* case quashed in the 1940s further underscores the obsolete nature of the Decrees.

---

[18]  *See* http://www.boxofficemojo.com.   Warner Bros, with about $1.9 billion in 2018 box office revenues, was a distant number two.

[19]  *See* Box Office by Studio 2018, http://www.boxofficemojo.com/studio/.

**B.      The *Paramount* Decrees' Per Se Prohibitions May Deter Procompetitive Conduct**

In the past seventy years, not only have there been significant changes in the motion picture industry, but also in the interpretation and application of the antitrust laws.   Courts now recognize that vertical mergers and restraints often can have procompetitive benefits.   The *Paramount* Decrees' treatment of certain conduct as *per se* illegal and subject to criminal penalties – no matter what the factual circumstances – prohibits conduct that today may be adjudged to be legal and beneficial to competition and consumers.   Thus, removing those prohibitions can well lead to business practices and innovations that benefit consumers.

**1.      Vertical Integration**

Both the Supreme Court and this Court held that the root of the antitrust problem in *Paramount* was Defendants' long-standing horizontal conspiracy.   The major Defendants' ownership of large theatre circuits facilitated that conspiracy.   *Paramount*, 339 U.S. at 174; 85 F. Supp. at 893.   The purpose behind the Decrees' divestiture provisions was not to outlaw vertical integration in the movie industry, but to end the Defendants' horizontal conspiracy.   *Id.* at 896 (divestiture is the "only adequate means of terminating the conspiracy and preventing any resurgence of monopoly power" on the part of Defendants).

Since the 1970s, the Supreme Court has recognized that vertical integration can create efficiencies that lower costs and encourage innovation that often results in better products and lower prices for consumers.   *See, e.g., Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 551 U.S. 877 (2007).   Under a fact-based rule of reason analysis, a court must weigh the competitive

22

harm of foreclosing competitors – either motion picture distributors from theatres; or movie theatres from a movie distributor's films – against any procompetitive efficiencies to determine whether a transaction violates the antitrust laws.  *See, e.g., United States v. Loew's Inc.*, 882 F.2d at 33 (holding that Warner could acquire a theatre company because "the changed nature of the motion picture exhibition industry has made [] foreclosure highly improbable").

Statutory merger law also has changed during the last seventy years.   At the time this Court entered the *Paramount* Decrees, companies could merge without any notification to the antitrust authorities.   Today, the Hart-Scott-Rodino Antitrust Improvements Act of 1976 (the "HSR Act"), codified at 15 U.S.C. § 18a, requires parties who engage in a significant merger transaction (*e.g.*, where the merger involves an acquisition of securities or assets valued over $90 million) to notify the federal antitrust agencies and permit them to investigate before their transaction can close.   A merger between any major movie distributor and one of the large national theatre circuits would very likely require HSR filings, thereby providing the antitrust agencies with notice and opportunity to evaluate the competitive effects of the transaction.   The Warner, Fox, and MGM Decrees' restrictions on vertical integration (requiring court approval to acquire a theatre) thus are no longer necessary.

### 2.   Film Licensing Restrictions

The *Paramount* Decrees flatly ban certain film licensing practices – such as block booking, circuit dealing, and resale price maintenance.   Courts today would analyze each of these vertical restraints under the rule of reason – evaluating the specific market facts to determine whether an antitrust foreclosure claim lies, and whether the agreement's

anticompetitive harm outweighs its procompetitive benefits.   *See, e.g., Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36 (1977) (non-price vertical restraints judged under rule of reason); *Leegin,* 551 U.S. 877 (2007) (extending rule of reason analysis to minimum resale price maintenance claims); *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2 (1984) (holding that tying arrangements [like block booking] are presumed to be *per se* illegal only in certain factual circumstances, including where the defendant had market power and where the tie foreclosed competitors from the tied market); *Southway Theatres, Inc. v. Georgia Theatre Co.*, 672 F.2d 485, 498 (5th Cir. 1982) (holding that circuit dealing may or may not be anticompetitive depending on the specific facts of a particular situation).[20]   In other words, absent the Decrees, it would be a factual question specific to a geographic market whether a *Paramount* Defendant's licensing terms illegally foreclosed competition in that geographic market.[21]

---

[20] Unlike the *per se* bans on block booking, circuit dealing, and resale price maintenance, the *Paramount* Decrees only ban "unreasonable" clearances.  *Paramount*, 334 U.S. at 144-46.  Thus, under the Decrees, the reasonableness of a clearance is evaluated under the rule of reason, as it would be for all film distributors or theatres pursuant to existing case law.  *See Theee Movies of Tarzana*, 828 F.2d at 1398-99, *citing Paramount*, 334 U.S. at 145-46.

[21] Apart from proof of foreclosure, antitrust claims based upon vertical distribution restraints require proof of market power.  *See, e.g., Leegin*, 551 U.S. at 897-98; *Illinois Tool Works Inc. v. Independent Ink, Inc.*, 547 U.S. 28, 46 (2006) (plaintiff must prove that defendant has market power in tying product); *Kaufman v. Time Warner*, 836 F.3d 137, 141-42 (2d Cir. 2016) (market power "essential" to tying claim); *K.M.B. Warehouse Distributors, Inc. v. Walker Mfg. Co.*, 61 F.3d 123, 129 (2d Cir. 1995) (plaintiff must show adverse effect on competition or market power).  None of the Defendants currently has a market share that evidences market power.  *See, e.g., In re Wireless Telephone Services Antitrust* Litigation, 385 F. Supp. 2d 403, 414 (S.D.N.Y. 2005) (30 percent market share insufficient to support *per se* tying claim).  Although motion pictures are copyrighted products, in 2006 the Supreme Court overruled the presumption that market power exists if the tying product is copyrighted.  *See Illinois Tool Works*, 547 U.S. at 31 ("mere fact that a tying product is patented does not support" presumption of market power).  Thus, a vertical antitrust claim based on a single film would require a court to determine whether that film or any film (for that matter) has or could have market power.   That would entail consideration of several factors uncommon to most consumer products.   For example, although each film is a unique product, this Court repeatedly has rejected "the proposition that unique products are markets unto themselves."  *Carell v. Shubert Org., Inc.*, 104 F.Supp.2d 236, 264 (S.D.N.Y. 2000) (market was products related to Broadway shows, not products related to *Cats*); *Global Disc. Travel Servs. LLC v. Trans World Airlines, Inc.*, 960 F. Supp. 701, 704-05 (S.D.N.Y. 1997); *Theatre Party Associates, Inc. v. The Shubert Organization, Inc.*, 695 F. Supp. 150 (S.D.N.Y. 1988).  *See also Todd v. Exxon Corp.*, 275 F.3d 191, 200 n.3 (2d Cir. 2001).   Moreover, a theatrical film's success at the time it is licensed often is

From an antitrust perspective, the film licensing practices that the Decrees prohibit concern "intrabrand," not "interbrand" competition.   Here, intrabrand competition refers to theatres competing to sell tickets to the same movie at the same time; interbrand competition refers to theatres competing to sell tickets to different movies – one theatre is showing film X at the same time a competing theatre is showing film Y.   The "primary concern of antitrust law" is interbrand competition, not intrabrand competition.   *Leegin,* 551 U.S. at 52 n. 19. Consequently, a court should analyze intrabrand vertical restraints, like those that the Decrees' prohibit, under the rule of reason because restraining intrabrand competition may be procompetitive and can also benefit interbrand competition.   *Id.*

For example, a film distributor might set minimum movie ticket prices in its theatrical license agreements to eliminate intrabrand price competition between theatres showing the same film at the same time.   Eliminating that competition would encourage those theatres to invest in better and more innovative consumer services – better seating, sound and projection systems, more amenities, and lower popcorn and soda prices – and more promotional efforts.   *Leegin,* 551 U.S. at 890-92.   In *Theee Movies of Tarzana*, 828 F.2d at 1397, 1400, the court found that vertical restraints in a film license that diminished intrabrand competition between two competing theatres were reasonable because they allowed one of the theatres that had invested in higher quality facilities, "state of the art projection and sound systems," and more promotion to recoup its investment.   The restraints also prevented the other movie theatre from free riding on the first

---

unpredictable (a film's demand typically is not known until it is exhibited) and, unlike typical consumer products, most films have a relatively short, non-durable temporal theatrical demand – typically lasting at most a few weeks.

theatre's film promotions and incented the restrained theatre to make "the investment necessary to turn it into a competitive movie theatre."   *Id.*

Vertical licensing restraints may also allow Defendants to engage in more efficient and innovative licensing transactions, and incent them to invest in more and higher quality motion pictures and higher promotional budgets.   Those developments likely would increase film output and box office revenues to the benefit of movie goers and theatres.   *Id*.

Finally, as the *Leegin* Court noted, vertical restraints that restrict intrabrand competition, may stimulate interbrand competition by facilitating market entry for new films and other products.   *Id.*   For example, although clearances can reduce intrabrand competition by preventing competing movie theatres from showing the same first-run film simultaneously, they encourage competition between distributors and between theatres by forcing the non-cleared theatre to exhibit and promote alternative movies.   *See, e.g., Orson, Inc. v. Miramax Film Corp.*, 862 F. Supp. 1378, 1383 (E.D. Pa. 1994) (clearances meant that competing theatre had to play other films, which increased interbrand competition); *Soffer v. National Amusements, Inc.*, 1996 WL 194947 (D. Conn. Jan. 10, 1996) (finding that clearances increased the overall choice of first-run films to movie-goers); *West Boylston Cinema Corp. v. Paramount Pictures Corp.*, 12 Mass.L.Rptr 530, 2000 WL 1468513, at *14. (Mass. Sup. Ct. Sept. 21, 2000) (dismissing clearance claim by weighing effects on intrabrand and interbrand film competition).

### C.   The Sherman Act Provides Effective Deterrence Against Any Collusion Among the Paramount Defendants to Monopolize the Motion Picture Distribution or Exhibition Markets

Terminating the decrees would release the *Paramount* Defendants from the Decrees'

licensing and other restrictions.   If the Defendants collectively, or any Defendant individually, however, engaged in anticompetitive behavior, they would be subject to liability under federal and state antitrust laws.   It is the case now, as it was in the 1930s and 40s, that horizontal agreements among film distributors to fix prices, divide markets, allocate customers, or engage in group boycotts are *per se* illegal.   *See United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 223 (1940) (conspiracy "formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity . . . is illegal per se"); *Klor's, Inc. v. Broadway-Hale Stores, Inc.,* 359 U.S. 207 (1959) (concerted refusals to deal or group boycotts *per se* illegal).   If the Defendants entered into such a horizontal agreement in the future, the United States could and would sue to stop the illegal conduct.   *See Loew's*, 783 F. Supp. at 214 (terminating *Paramount* Loew's Decree and finding it "significant []" that the Justice Department could again bring suit if necessary).

Importantly, any illegal conduct also would be subject to potential private treble damage actions.   *See, e.g.*, *United States v. Microsoft Corp.*, 56 F.3d 1448, 1461 n.9 (D.C. Cir. 1995) ("decree does not preclude [third party] from bringing its own private antitrust suit against Microsoft to gain the specific relief it seeks").   Absent the Decrees, injured motion picture producers and theatres could sue under the Sherman Act and state antitrust statutes.   Indeed, theatre owners have challenged clearances and other licensing terms under state and federal law. *See, e.g.*, *Regal Entertainment Group v. IPic-Gold Class Entertainment, LLC*, 507 S.W.3d 337 (Ct. of Appeals of Texas 2016) (ruling that overbroad clearance illegally allowed large theatre circuit to foreclose boutique theatre chain from first-run movies); *Cobb Theatres III, LLC v. AMC*

*Entertainment Holdings, Inc.*, 101 F. Supp.3d 1319 (N.D. Ga. 2015) (denying motion to dismiss claims against theatre chain for circuit dealing and overbroad clearances); *2301 M Cinema LLC v. Silver Cinemas Acquisition Co.*, 342 F. Supp.3d 126 (D.D.C. 2018) (denying motion to dismiss against theatre chain for overbroad clearances); *Cinema Village Cinemart, Inc. v. Regal Entertainment Group*, 2016 WL 5719790 (S.D.N.Y. Sept. 29, 2016) (allegation of clearance agreement between theatre and film distributors insufficient to state antitrust claim).   As these and other cases make clear, absent the Decrees, any plaintiff, whether the United States or a private plaintiff, still could have the advantage of the Supreme Court's and this Court's rulings in the *Paramount* litigation that resulted in the Decrees.

> **D.      The Proposed Two-Year Sunset Period for the Block Booking and Circuit Dealing Provisions Further Protects Movie Theatres**

For over seventy years, the *Paramount* Decrees have required Defendants to license their films on a film-by-film, theatre-by-theatre basis.   Terminating the *Paramount* Decrees immediately, but including a two-year sunset period for the Decrees' block booking and circuit dealing provisions would provide movie theatres a transitional time period to adjust their business models and strategies to any proposals to change the film-by-film, theatre-by-theatre licensing regime.   A sunset period also would be equitable – responding to the concerns that the movie theatres raised in their public comments.   *See IBM*, 719 F.2d at 567 (court has "equitable power" to add "phase-out" period to existing decree).

> **V.      The Public Comments That the Department Received Do Not Establish That Continuing the Decrees Would Serve the Public Interest**

As noted above, the United States solicited public comments with regard to whether the

*Paramount* Decrees should be terminated or modified.   On August 1, 2018, the Antitrust

Division issued a press release announcing that it had opened an investigation to review the

*Paramount* Decrees.   (Attached as Appendix F).   On that same day, the Division posted a

notice on its public website describing the investigation and seeking public comments.

(Appendix G).   On August 16, the United States extended the public comment period from 30 to

60 days.

　　　The United States received 82 comments.[22]   *See* https://www.justice.gov/atr/paramount-

consent-decree-review-public-comments-2018.   One comment supported terminating the

Decrees.   Eighty-one comments opposed terminating some or all of the Decrees' provisions.

The comments opposing termination of the Decrees came from individuals, movie theatre trade

groups – NATO, and the ICA,[23]  regional movie theatre chains – Bow Tie Cinemas (245 screens),

Fridley Theatres (90 screens), Harkins Theatres (501 screens), Marcus Theatres (700 screens),

and National Amusements, Inc. (392 screens), single theatres, including thirty from drive-in

theatres, and other trade groups.   There were no comments from motion picture producers or

distributors.

　　　The comments in opposition fall into two general categories: (1) comments relating to film

---

[22] Thirty of the comments came from drive-in theatres.   These comments adopted in form the comment of the United Drive-In Theatre Owners Association.

[23] NATO is the largest movie theatre trade organization in the United States.   It represents more than 33,000 movie screens (large theatre chains and hundreds of independent movie theatre owners).   The ICA represents theatres that serve small town and rural markets.   It represents 236 theatres with over 2,600 screens.   NATO seeks to preserve the prohibition on block booking – it does not seek to preserve the vertical integration or other vertical licensing restrictions contained in the Decrees.   The ICA seeks to preserve the *Paramount* Decrees in total.

distributors' acquisition of theatres; and (2) comments relating to film distributors' licensing practices.[24]   Critically for this motion, not one of the comments establishes that there is a likelihood that the remaining *Paramount* Defendants would again collude to impose an anticompetitive distribution system or anticompetitive terms in their theatrical film licensing agreements.   Nor do the comments establish that the current antitrust laws are inadequate to police any such collusion.   Set forth below are summaries of the issues that the commenters raised and the United States' responses to those issues.

### A.   The United States' Responses to Public Comments Regarding Vertical Integration in the Motion Picture Industry

Several commenters argue that the Decrees' provisions that regulate certain Defendants from acquiring movie theatres should be preserved.[25] The Roosevelt Institute and Open Markets claim that terminating the ban on vertical integration would allow major movie studios to merge with one of the large national theatre circuits – AMC, Cinemark or Regal.   The Writers Guild and several local theatres express concerns that vertical integration would lead to movie studios

---

[24] Several of the public comments did not bear on any issues relating to the *Paramount* Decrees or the antitrust merits of terminating the Decrees.   While the United States did undertake herein to respond generally or specifically to all germane public comments, we do not address those that are wholly outside the scope of this motion.   Following are the subjects that arose in comments we determined not relevant to the Department's review of the *Paramount* Decrees because the Decrees do not regulate these subjects:   (1) media ownership in the United States is too concentrated; (2) large theatre circuits make it difficult for smaller theatres to compete; (3) the Decrees should be modified to cover The Walt Disney Company; (4) today's movies should appeal to broader audiences; (5) the Decrees should be modified to prevent movie distributors from requiring theatres to exhibit movies for minimum periods of time; and (6) the United States should prevent The Walt Disney Company's acquisition of Twentieth-Century Fox.

[25] NATO and several other commenters cite to *U.S. v. Loew's, Inc.*, 705 F. Supp. 878 (S.D.N.Y. 1988), where this Court declined to modify the Warner Decree to let Warner Bros acquire certain movie theatres.   The Second Circuit overruled that decision and allowed Warner Bros to acquire the theatres without any restrictions.   *See Loew's,* 882 F.2d 29.

only showing their films in their owned theatres, thus foreclosing independent theatres from that content and independent producers from those theatres.   We address the current antitrust law relating to vertical integration at Section IV B.1 *supra.*

The commenters misunderstand the Decrees.   First, because the Decrees' vertical restrictions apply only to a subset of movie distributors, they do not prohibit the vertical integration that the commenters fear.   For example, the Decrees do not prohibit The Walt Disney Company from vertically integrating because Disney is not a *Paramount* Defendant.   Second, the Decrees do not prohibit any Defendant from acquiring theatres.   Four Defendants – Paramount, Universal, Columbia, and United Artists – have always been free to acquire theatres. Three Defendants – Fox, MGM, and Warner Bros – are required to seek court approval before acquiring theatres.   Not only is there no apparent reason to single out and hold to a different standard these three Defendants, but the requirement serves little or no competitive purpose.   As stated above, the HSR Act would provide the federal antitrust agencies with notice and the opportunity to evaluate the competitive significance of any major transaction between a movie distributor and a theatre circuit.   The Warner, Fox, and MGM Decrees' separate premerger notification procedures are largely duplicative of that process and hence unnecessary.

### B.      The United States' Responses to Public Comments regarding Motion Picture Distribution and Licensing Practices

Several commenters state that the Decrees' film licensing provisions should be preserved in whole or in part.   We generally address the current antitrust law relating to film licensing restrictions at Section IV B.2 *supra.*   In this section, we discuss comments relating to the individual licensing practices that the Decrees currently ban.

As an initial matter, for purposes of this motion, the question is not whether a Defendant's unilateral imposition of a specific licensing term, like block booking or circuit dealing, would be illegal, but whether absent the Decrees, Defendants would illegally collude to impose standard distribution or licensing terms in their movie theatre agreements.   None of the comments establishes a likelihood that Defendants would engage in industry-wide collusion to do so.

### 1.    Block Booking

Many commenters, including NATO and ICA, believe that the Decrees' restrictions on block booking should be preserved.[26]   The commenters generally argue that ending the prohibition on block booking would: (1) allow Defendants to book their entire film slates for multiple week runs that would foreclose independent distributors from those screens; (2) financially disadvantage small town or limited screen theatres; and (3) enhance Defendants' leverage in their license negotiations with theatres.

In the 1930s and 40s, the *Paramount* Defendants, except United Artists, required block booking provisions in many of their theatrical licenses; and they often required first-run theatres to license their entire season's output of films.   *Paramount*, 66 F. Supp. at 347; 70 F. Supp. at 63.   In those days, requiring a key group of marquee theatres to show all of the Defendants' films – one after the other – tied them up for weeks or months, thus "foreclosing" independent distributors from the strategic first-run theatres they needed to successfully launch and distribute

---

[26] NATO, citing *Paramount*, 334 U.S. at 158-59, and other commenters argue that block booking is anticompetitive because "conditioning the licensing of one copyright on the purchase of another" is *per se* illegal.   As stated above, and as NATO itself acknowledges towards the end of its comment, the Supreme Court in *Illinois Tool Works,* 547 U.S. at 31, overruled the *Paramount* decision (as well as *U.S. v. Loew's, Inc.*, 371 U.S. 38 (1962) (another case that NATO cites)) on this point.

their films.

Today, although there may be some areas with only a single one-screen theatre, most markets have multiple movie theatres with multiple screens simultaneously showing multiple movies from multiple distributors.[27]   There also are many other movie distribution platforms, like television, the Internet and DVDs, that did not exist in the 1930s and 40s.   Given that there is no shortage of theatres and screens, there is little danger that a block booking licensing agreement would create a barrier to entry that would foreclose independent movie distributors from sufficient access to the market.[28]   *See, e.g. Gonzalez v. St. Margaret's House Housing Development Fund Corp.*, 880 F.2d 1514, 1516-17 (2d Cir. 1989) (plaintiff must prove that the tie impairs competition in the tied market and forecloses a substantial volume of commerce in that market); *305 East 24th Owners Corp. v. Parman Co.*, 714 F. Supp. 1296, 1307 (S.D.N.Y. 1989) (holding that even if plaintiffs could prove market power in the tying market, plaintiffs still would have to prove that the tie had a substantial impact on competitors in the tied market).

NATO and other commenters also argue that removing the Decrees' *per se* ban on block booking would enhance each Defendant's bargaining power to gain more favorable licensing terms in its individual negotiations with movie theatres and theatre circuits.   But standing alone,

---

[27] NATO acknowledges that there are more than 40,000 movie screens in 5,500 theatres in the United States.   *See* fn. 12, *supra*.

[28] NATO and other commenters note that the "major movie studios," prioritizing "high budget films," are making fewer films today, as compared to the early 2000s, let alone the 1940s.   NATO Comment, at 3 ("In 2002, the six major studios released an average of 23 movies each.   In 2017, that number dropped to 14.").   Although that fact would seem to open up more screens for independent distributors, NATO and other commenters state that the major studios are requiring "longer theatrical runs" for their blockbuster films, thus decreasing available screens.   The *Paramount* Decrees, however, do not regulate the length of a film's theatrical run so retention of the block-booking ban would not address that concern.

this increased leverage, if true, would not present an antitrust issue unless it resulted from changes in competition among movie distributors or, for that matter, from any horizontal agreements among movie distributors to restrain competition.

Nevertheless, to the extent that a Defendant engaged in block booking, it would end the film-by-film license structure that the Decrees currently mandate.   Given that potential disruption, the United States proposes to add a two-year sunset to Section II, Paragraph 7 to the Decrees (Section III, Paragraph 7 of the Warner Decree) to provide for a transition period which would allow the Defendants and movie theatres to adjust their business plans accordingly.

### 2.     Circuit Dealing

ICA, Harkins Theatres, Marcus Theatres, the Writers Guild, Odyssey Theatres, the Trinity Theatre, National Amusements, and other commenters argue that the *Paramount* Decrees' circuit dealing provisions should be preserved.   These provisions require that films be licensed on a theatre-by-theatre basis, and prohibit licensing on a circuit-wide basis.   For example, AMC owns and operates over 380 movie theatres in the United States, with over 8,000 screens.   Instead of one film license that covers all AMC theatres, the *Paramount* Decrees require each Defendant to license its films to AMC on a theatre-by-theatre basis.   The commenters argue that absent the theatre-by-theatre license requirement, large theatre circuits could deny smaller and independent theatres the chance to bid on and show popular first-run films in their local markets.

In the 1930s and 40s, the *Paramount* Defendants illegally agreed among themselves to use circuit deals to ensure that the first run of their films played in the theatres that the major Defendants owned and controlled, thus foreclosing independent theatres from those films' first

runs.   *Paramount,* 70 F. Supp. at 63.   By doing so, Defendants used their collective market

power in film distribution to gain a monopoly in the first-run theatre market.   Because the

Decrees ended the collusion and required the major Defendants to separate their film distribution

and theatre operations, and the industry no longer uses sequential theatrical runs, it is unlikely that

any collective attempt by Defendants to once again monopolize the theatre market would or could

reoccur.

 Just as importantly, the commenters' arguments do not speak to antitrust foreclosure.

Although a Defendant's circuit deal might foreclose a theatre from a specific film or that

Defendant's film slate, standing alone, that does not state an antitrust claim unless the theatre is

unable to license films from other motion picture distributors.   *See Ralph C. Wilson Industries,*

*Inc. v. Chronicle Broadcasting Co.*, 794 F.2d 1359, 1364 (9th Cir. 1986) (holding that exclusive

vertical license between a content supplier and a television station does not violate the antitrust

laws).   *See also Northeastern Educational Television of Ohio, Inc. v. Education Television*

*Assoc.,* 758 F. Supp. 1560, 1561 (N.D. Ohio 1990).   As long as the theatre has access to other

movie distributors' films, competition is not foreclosed.   *See, e.g.*, *Bay City-Abrahams Bros.,*

*Inc. v. Estee Lauder, Inc.*, 375 F.Supp. 1206, 1214 (S.D.N.Y. 1974) (holding that if a vertical

restraint simply confines a distributor's products to selected dealers, "*and if competitive products*

*are readily available to others,*" the vertical restraint does not violate the Sherman Act); *Roy B.*

*Taylor Sales, Inc. v. Hollymatic Corporation*, 28 F.3d 1379, 1383 (5th Cir. 1994) (there can be no

foreclosure if there are "alternative paths to consumers").

 Nevertheless, given the commenters' concerns, the United States proposes to add a two-

year sunset period to Section II, Paragraphs 6 and 8 to the Decrees (Section III, Paragraphs 6 and 8 to the Warner Decree), which would provide a transition period.

### 3.    Resale Price Maintenance

Several commenters, including ICA, the Writers Guild, Marcus Theatres, Harkins Theatres, and National Amusements, Inc., argue that the Decrees' prohibition on resale price maintenance should be preserved.   The gist of these comments is that allowing Defendants to set minimum movie theatre ticket prices would (1) remove from the movie theatres the ability to compete against other theatres based on ticket prices; and (2) stifle a movie theatre's ability to offer variable and innovative movie ticket pricing options.[29]   None of these comments address or weigh the procompetitive benefits of resale price maintenance.

In the 1930s and 40s, Defendants agreed to set uniform theatre ticket prices for each sequential theatrical run to minimize ticket price competition between the major Defendants' first-run theatres and independent subsequent-run theatres in the same geographic market. *Paramount*, 66 F. Supp. at 334, 340 ("fixing of minimum prices, attempts to give the prior run exhibitor as near a monopoly of the patronage as possible").   As stated above, the *Paramount* Case ended the Defendants' "national system to fix prices," as well as the major Defendants' ownership of major theatre circuits.   Moreover, the sequential run and clearance system that controlled competition between first-run and subsequent-run theatres no longer exists.   Given

---

[29] Several commenters note that movie distributors, including Defendants, "indirectly" and legally set movie ticket prices today through the use of "per capita" ticket licensing terms.   Per capital licensing requires movie theatres to pay licensing fees based upon a scaled percentage of movie tickets sold, without regard to movie ticket prices.   *See General Cinema Corp. v. Buena Vista Dist. Co.*, 681 F.2d 594 (9th Cir. 1982) (holding that *per capita* licensing terms are permissible).

these material changes, it is unlikely that removing the ban on resale price maintenance would result in a return to the collusion of the 1930s and 40s.

In addition, in 2007, the Supreme Court made clear that resale price maintenance is not *per se* illegal because there are many "procompetitive justifications for a manufacturer's use of resale price maintenance."  *Leegin,* 551 U.S. at 887-88, 890-92.   In *Leegin* the Supreme Court expressly rejected the argument that "the *per se* rule is justified because a vertical price restraint can lead to higher prices. . . ."  *Id.* at 890-92.   The mere fact of a "price effect" without "a further showing of anticompetitive effects" is insufficient to state an antitrust claim.  *Id.*

### 4.      Unreasonable Clearances

Several commenters also argue that the Decrees' provisions with respect to clearances should be preserved.   As stated above, the *Paramount* Decrees only ban "unreasonable" clearances.   Courts, without recourse to the Decrees, have found clearances between two competing theatres to be "reasonable" when those theatres are found to be in "substantial competition" with each other geographically, and where the distributor uses the clearance to assure the licensee theatre that its competitor will not simultaneously show the same film.  *See Paramount,* 334 U.S. at 145-46.   Because clearances are evaluated under the same fact-specific, rule of reason under existing case law as they are under the Decrees, the Decree's clearance provisions are not necessary to protect competition.

### 5.      Termination of the Paramount Decrees Could Open the Motion Picture Industry to New Distribution and Licensing Arrangements

To the extent that the termination or sunset of the Decrees would result in changes to the distribution and licensing arrangements between Defendants and movie theatres, it may well

foster new and innovative distribution and licensing agreements that are legal, efficient, and beneficial to industry participants, as well as movie goers.   Unlike the Decrees, the antitrust laws do not dictate or impose a specific distribution model or require distributors to bid or license their products to every customer or even to the highest bidder.[30]   Absent the Decrees, some existing movie theatres or movie distributors may thrive, while others may not.   The Supreme Court long ago recognized that by protecting and ensuring competition, the Sherman Act can expose market participants to commercial harm.   *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 767-68 (1984).   But commercial harm, without more, is not an antitrust violation because the antitrust laws serve to protect competition, not competitors.   *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977).   The Second Circuit recognized this when terminating a consent decree despite unfavorable public comments:   the Sherman Act does not "protect businesses from the workings of the market," its purpose is "to protect the public from the failure of the market."   *IBM*, 163 F.3d at 741 (*quoting Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458 (1993).

---

[30] As a general rule, a seller has the right to sell its products to selected customers on terms that reflect the seller's decisions on how it wants its own products distributed.  *See United States v. Colgate*, 250 U.S. 300, 307 (1919); *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 762 (1984) ("[a] manufacturer of course generally has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently").   Indeed, the Second Circuit has held that movie distributors are free to refuse to license their films to any movie theatre as long as they act "unilaterally."  *Beech Cinema, Inc. v. Twentieth Century-Fox Film Corp.*, 622 F.2d 1106, 1107 (2d Cir. 1980).

## VI.    Conclusion

For the foregoing reasons, the United States respectfully requests that this Court to

terminate immediately each of the *Paramount* Decrees, except to add a two-year sunset provision

to Section II, Paragraphs 5, 6, 7, and 8 of each of the Decrees (Section III, Paragraphs 5, 6, 7, and

8 to the Warner Decree).

Respectfully submitted,

FOR PLAINTIFF UNITED STATES OF AMERICA:


/s/_____
Makan Delrahim
Assistant Attorney General
United States Department of Justice
Antitrust Division
950 Pennsylvania Avenue, N.W.
Washington, DC 20530

/s/_____
Yvette F. Tarlov
Assistant Chief, Media, Entertainment & Professional
Services Section
United States Department of Justice
Antitrust Division
450 Fifth Street, N.W., Suite 4000
Washington, DC   20530


/s/_____
Mark A. Merva
Trial Attorney
United States Department of Justice
Antitrust Division
450 Fifth Street, N.W., Suite 4000
Washington, DC   20530
Telephone: (202) 616-1398
Facsimile: (202) 514-7308
E-mail: mark.merva@usdoj.gov

/s/_____
Lawrence Reicher
Counsel to the Assistant Attorney General
United States Department of Justice
Antitrust Division
950 Pennsylvania Avenue, N.W.
Washington, DC 20530



Date:   November 22, 2019