IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,    )
    )
           Plaintiff,    )
    )
      v.    )
    )
PARAMOUNT PICTURES, INC.,    )
    )
          Defendant.    )
————————————————————)
UNITED STATES OF AMERICA,    )    Case 1:19-mc-00544-AT
    )
           Plaintiff,    )
    )
      v.    )
    )
LOEW'S INCORPORATED, ET AL.,    )
    )
          Defendants.    )
————————————————————)

**_AMICUS CURIAE_ INDEPENDENT CINEMA ALLIANCE'S MEMORANDUM
IN OPPOSITION TO THE DEPARTMENT OF JUSTICE'S
<u>MOTION TO TERMINATE THE PARAMOUNT CONSENT DECREES</u>**

G. Kendrick Macdowell
Counsel, Independent Cinema Alliance
D.C. Bar No. 436375
(214) 782-9985
kendrick27@yahoo.com

James J. Mahon
Becker & Poliakoff LLP
Local Counsel for ICA
45 Broadway
17th Floor
New York, New York 10006
(212) 599-3322
Jmahon@beckerlawyers.com

# TABLE OF CONTENTS

Table of Authorities...................................................................... iii

INTERESTS OF AMICI.................................................................. 1

INTRODUCTION.......................................................................... 3

ARGUMENT................................................................................ 4

I.      The DOJ Suggests a Standard of Review
Contrary to Case Law and Common Sense.............................................. 4

II.     The DOJ Project Concerning "Legacy" Consent Decrees Sweeps
Too Far in Targeting the Paramount Consent Decrees, Which Have
Brilliantly Served the Motion Picture Industry.......................................... 6

        A.     The DOJ's Inadequate Inquiry Conspicuously Ignored the
"Theatre-By-Theatre" Mandate, Identified by This Court as the
Heart of the Paramount Consent Decrees..................................... 7

        B.     The DOJ's Mere Incantation of "Change" in the Motion Picture
Industry Is No Substitute for a Factual Inquiry Into Whether Such
Change Materially Eliminates the Inclination to Antitrust Abuse............ 11

        C.     The Paramount Consent Decrees Call for None of the Scrutiny
Sometimes Associated With Collusive and Other Problematic
Consent Decrees.................................................................. 17

CONCLUSION............................................................................. 19

## TABLE OF AUTHORITIES

**Cases**

*Admiral Theatre Corp. v. Douglas Theatre Co.*, 585 F.2d 877 (8th Cir. 1978)................16

*Cobb Theatres III, LLC v. AMC Entmt. Holdings, Inc.*, 101 F.Supp.3d 1319, 1331 (N.D. Ga. 2015).....................................................................................................16

*Don George, Inc. v. Paramount Pictures*, 111 F. Supp. 458 (W.D. La. 1951)..................18

*Patterson v. Newspaper & Mail Deliverers Union*, 797 F. Supp. 1174 (S.D.N.Y. 1992).......5

*Regal Entm't Grp. v. Ipic-Gold Class Entm't, LLC*, 507 S.W.3d 337 (Tex. App. 2016)........16

*Rufo v. Inmates of Suffolk Cty. Jail*, 502 U.S. 367 (1992)............................................5

*United States v. American Cyanamid Co.*, 719 F.2d 558 (2d Cir. 1983)..........................6

*United States v. District Council of NYC and Vicinity of the United Brotherhood of Carpenters and Joiners of America*, 571 F. Supp. 2d 555, 557, 563 (S.D.N.Y. 2008)..........5

*United States v. International Business Machines Corp.*, 163 F.3d 737 (2d Cir. 1998)........4, 5

*United States v. Loew's Inc.*, 705 F. Supp. 878 (S.D.N.Y. 1988)............................7, 9, 17

*United States v. Paramount Pictures, Inc.*, 1940-1943 Trade Cas. (CCH) ¶ 56,072 (S.D.N.Y. 1940)...................................................................................19

*United States v. Paramount Pictures, Inc.*, 334 U.S. 131 (1948)................................1, 17

*United States v. Swift & Co.*, 286 U.S. 106 (1932)..................................................4

## Other Authorities

H. Alexander and R. Blakely, "The Triumph of Digital Will Be the Death of Many Movies," *The New Republic* (Sep. 12, 2014)......................................................15

K. Fox, *Paramount Revisited: The Resurgence of Vertical Integration in the Motion Picture Industry*, 21 Hofstra L.R. 505 (1992)..............................................19

Comments of Harkins Theatres (Oct. 4, 2018), available at https://www.justice.gov/atr/page/file/1102441/download......................................11

M. Conant, *Antitrust in the Motion Picture Industry: Economic and Legal Analysis* (Univ. of Cal. Press 1960).....................................................................14, 16

M. Conant, *The Paramount Decrees Reconsidered*, 44 LAW & CONTEMP. PROBS. 79 (1981).....................................................................................12

Deadline Hollywood, "Distribs & Exhibs Hold Line On Clearances Despite
Fox's Position Change" (Mar. 31, 2016)............................................................8

"Department of Justice Announces Initiative to Terminate 'Legacy' Antitrust Judgments"
(April 25, 2018)............................................................................................6

W.A. Galston & C. Hendrickson, *A policy at peace with itself: Antitrust remedies for our
concentrated, uncompetitive economy*, Brookings Institute (Jan. 5, 2018).......................13

A. Grossman, Former Visiting Fellow, American Heritage Foundation, *Use and Abuse
of Consent Decrees in Federal Rulemaking*, Testimony before the Subcommittee on the
Courts, Commercial and Administrative Law, Committee on the Judiciary, United States
House of Representatives (February 3, 2012)......................................................18

*The Hollywood Reporter,* "Cobb Theatres Argues Jury Should Decide Antitrust Case
Against AMC" (Nov. 7, 2016)..........................................................................8

Independent Cinema Alliance https://www.cinemaalliance.org/ .................................1

J. Shapiro, "The DOJ, Exhibition, And That Terrible, Horrible, No Good, Very Bad Day"
(BirthMoviesDeath.com Nov. 21, 2019)...............................................................2

Open Markets newsletter, "Lights, Camera, Monopoly: DOJ Could Revive the Studio
System" (Aug. 24, 2018)...........................................................................12-13

"The Paramount Decrees" https://www.justice.gov/atr/paramount-decree-review
(updated October 20, 2018) ............................................................................7

Wikipedia, the Free Encyclopedia, "Virtual Print Fee"............................................16

## INTERESTS OF *AMICUS* INDEPENDENT CINEMA ALLIANCE

The Independent Cinema Alliance ("ICA") is a non-profit corporation representing 236 independent cinema companies with 2,672 screens, and growing. The ICA's stated mission is to promote the preservation and prosperity of independent cinemas[1] as an essential part of a healthy motion picture industry. As an advocacy group on behalf of independent cinemas, the ICA is uniquely positioned to urge preserving the Paramount Consent Decrees, which foremost seek to protect independent cinemas. The Paramount Consent Decrees happened because the Department of Justice ("DOJ") seven decades ago stepped into an industry rife with antitrust abuse and on behalf of independents and their patrons. As the Supreme Court declared:

> The trade victims of this conspiracy have in large measure been the small independent operators. They are the ones that have felt most keenly the discriminatory practices and predatory activities in which defendants have freely indulged. They have been the victims of the massed purchasing power of the larger units in the industry. It is largely out of the ruins of the small operators that the large empires of exhibitors have been built.

*United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 162 (1948).

In stark contrast, the current DOJ treats independent cinemas as inconsequential players in an industry rightly dominated by Big Production, Big Exhibition, and increasingly, Big Streamers. But independents make unique and essential contributions to a healthy motion picture industry. They are not merely incidental miniatures of the big circuits and not small businesses

---

[1] For purposes of eligible membership in the ICA, "independent" means:

• not publicly owned or owned in whole or in part by a motion picture distributor, motion picture studio or other content supplier, including a supplier of electronic content;
• market share of domestic theatrical revenue does not exceed 2%;
• not owned in whole or in part by a national or regional circuit having a domestic theatrical revenue share of more than 2%; and
• consolidated screen count does not exceed 500 screens.
*See generally* Independent Cinema Alliance https://www.cinemaalliance.org/

seeking special treatment. Quite the contrary, independents *ensure* a healthy motion picture

industry because:

- independents serve small-town and rural markets that would typically not have a cinema but for the dedication of independents to their communities;

- hundreds of thousands of Americans who love big-screen entertainment would never see motion pictures on the big screen if independents disappeared, because the big circuits would never go into such small markets;

- independents are frequently industry innovators because they *must* innovate to find ways to survive in an industry dominated by big players;

- independents often depart (necessarily) from the Big Exhibition paradigm of featuring only the biggest Hollywood fare, and thus diversify the motion picture entertainment available to patrons[2] (*e.g.*, art films, niche films such as Hispanic and faith-based films, and films by independent producers generally);

- independents frequently become integral components of their communities and provide services and contributions that connect the big screen to special community watersheds (film festivals, community fundraising, children's matinees, showings of classic movies, special pricing for veterans/first-responders/active military, sponsoring local events on the big screen);

- the average ticket price for independents is significantly lower than the average ticket price for big circuits, and independents generally operate at lower margins than circuits command; and

- even in urban markets, where a few independents survive, they are the only remaining check against big circuit monopoly power, and frequently innovate in pro-consumer ways to compete (*e.g.*, family entertainment centers).

---

[2]     *See* J. Shapiro, "The DOJ, Exhibition, And That Terrible, Horrible, No Good, Very Bad Day" (BirthMoviesDeath.com Nov. 21, 2019), at https://birthmoviesdeath.com/2019/11/21/the-doj-exhibition-and-that-terrible-horrible-no-good-very-bad-day (detailing "diversity index" of exhibitors, *i.e.*, the diversity of content featured by exhibitors, and confirming that top exhibitors have, by far, the lowest diversity index, meaning they all show the same highly promoted big studio content, and concluding: "The DOJ assumes that since we have so many theaters now and these theaters have so many screens, they are competing with different kinds of product. As we can see, that is not the case. **The biggest chains are competing with everything EXCEPT content. A main factor the smaller chains use for competition is their diversity of content, and the DOJ is making it harder for that type of content to have a chance.**") (emphasis added).

2

In sum, motion picture consumers benefit enormously because, compared to big circuits, independents vitally contribute more diverse content, in more diverse places, more inexpensively, and in more diverse and creative ways. But they achieve these pro-competition and pro-consumer benefits increasingly in competitively hostile and cost-crippling circumstances. The big players in the motion picture industry are doing fine. For independents it is a labor of love, and they are being forced out of business in growing numbers.

## INTRODUCTION

In conspicuous contrast to decades of DOJ predecessors, *this* DOJ insists upon fixing a system that is not broken and does so with a breezy and inadequate factual inquiry and literally no meaningful investigation. Its driving motivation has little to do with the merits of the Paramount Consent Decrees or what impact they have historically had on the motion picture industry, and much more to do with the housekeeping concern that the Decrees lack a termination date. Thus the DOJ is concerned to be rid of nearly 1,300 so-called "legacy" consent decrees, including the Paramount Consent Decrees.

The Paramount Consent Decrees have well served the motion picture industry for decades, and indeed have become an integral part of industry culture. These are not esoteric or merely technical legal documents. People who may not have heard of the Sherman Act or the Clayton Act have heard of, and invoke, the Paramount Consent Decrees. For independent cinemas especially – the express beneficiaries of the *Paramount* litigation that led to the Decrees – the Decrees constitute a continuing lifeline, a way to remain competitive in an industry still inclined to anticompetitive abuse. Independents especially rely upon what this Court has expressly described as the heart of the Paramount Consent Decrees: the mandate that motion pictures be licensed "theatre by theatre, solely upon the merits and without discrimination in

3

favor of affiliated theatres, circuit theatres or others." Yet that heart gets no attention or

meaningful mention by this DOJ. Instead, this DOJ points aimlessly to "changes" in the industry,

without making any persuasive argument or evidentiary showing that such changes warrant

disturbing Consent Decrees that have demonstrably deterred significant anticompetitive conduct.

To be sure, the motion picture industry has "changed" – most relevantly in the direction

of even greater concentration and consolidation. It is not the time to strip the industry of the most

powerful and elegant expression of motion picture distribution fairness ever articulated.

## ARGUMENT

### I.     The DOJ Suggests a Standard of Review
###     Contrary to Case Law and Common Sense.

As a threshold matter, the DOJ correctly identifies the appropriate "public interest"

standard in assessing termination of consent decrees, but then adds a frankly bizarre burden-

shifting requirement that the consent decree should be terminated unless *other parties* somehow

prove that anticompetitive conduct is likely to recur. *See, e.g.,* DOJ Mem. at 5 ("not one

comment identifies any ground to conclude that – absent the Decrees – Defendants would

collude to re-impose uniform distribution and licensing schemes on movie theatres. Under

Second Circuit law, that is the key question for this motion.") (*misconstruing United States v.

International Business Machines Corp.*, 163 F.3d 737 (2d Cir. 1998)). Disturbing a consent

decree, especially an antitrust decree reached, as here, after extensive litigation proving abundant

antitrust abuse, has always required a substantial showing by the moving party.[3] The DOJ cannot

now shift the burden to some other party to "prove" the future recurrence of antitrust abuse.

---

[3]      *Compare United States v. Swift & Co.*, 286 U.S. 106 (1932) (requiring strict review of
whether changes truly warrant disturbing antitrust consent decree and concluding that "[t]he
inquiry for us is whether the changes are so important that dangers, once substantial, have
become attenuated to a shadow" and insisting that "[n]othing less than a clear showing of

4

The DOJ's only authority, *U.S. v. IBM*, 163 F.3d 737 (2d Cir. 1998), condemns in multiple ways what the DOJ breezily seeks here. Conspicuously unlike the circumstances here, the *U.S. v. IBM* court agreed to the termination of an antitrust consent decree only because:

- most provisions of the consent decree had already been terminated, without concern or disturbance to the market, and the question was whether the final two surviving provisions could properly be terminated in the public interest, *id.* at 739,

- the motion to terminate the two remaining provisions was preceded by the DOJ's "detailed investigation [which] included the review of more than 100,000 pages of IBM documents, including its strategic business plans, and interviews with IBM's customers, competitors, and executives," *id.*,

- the DOJ's "detailed investigation" yielded the finding that *none of IBM's customers* opposed termination of the remaining provisions of the consent decree, *id.*,

- despite this substantial fact-finding by the DOJ *before* it presumed to disturb what little was left of the decree, the district court *still* ordered a period of public comment, *id.*,

- during the period of public comment, only *one* of IBM's customers commented, and that customer favored termination, *id.*

That was a consent decree that had clearly outlived its usefulness. At a minimum, *U.S. v. IBM* points to the necessity of a *much* fuller factual inquiry than the DOJ has done. More to the point, as the party bearing the burden to prove that a consent decree must be disturbed, the DOJ's motion should be denied outright because the DOJ failed to make the showing it must. Changing antitrust enforcement philosophy and undertaking a housekeeping operation to get rid of old

---

grievous wrong evoked by new and unforeseen conditions should lead us to change what was decreed after years of litigation with the consent of all concerned") *with Rufo v. Inmates of Suffolk Cty. Jail*, 502 U.S. 367, 383 (1992) (at least in the special context of "institutional reform" cases, a more flexible standard applies, but still requires the moving party to prove that significant changes warrant disturbing the decree *and* that "the proposed modification is suitably tailored to the changed circumstances"); *see also United States v. District Council of NYC and Vicinity of the United Brotherhood of Carpenters and Joiners of America*, 571 F. Supp. 2d 555, 557, 563 (S.D.N.Y. 2008) ("Before exercising its power to modify or vacate a judicial decree, a court must be convinced by the party seeking relief that the purposes of the litigation as incorporated into the decree have been fully achieved.") (quoting *Patterson v. Newspaper & Mail Deliverers' Union*, 797 F. Supp. 1174, 1179 (S.D.N.Y.1992)).

consent decrees comes nowhere near making the showing that the DOJ must make to disturb the Paramount Consent Decrees. *See United States v. American Cyanamid Co.*, 719 F.2d 558 (2d Cir. 1983) (new DOJ opinions do not suffice to disturb an antitrust consent decree).

## II.     The DOJ Project Concerning "Legacy" Consent Decrees Sweeps Too Far in Targeting the Paramount Consent Decrees, Which Have Brilliantly Served the Motion Picture Industry.

Since issuance of the Paramount Consent Decrees, the DOJ has several times parachuted into the motion picture industry to investigate competitive circumstances and monitor the impact of the Decrees. On every past occasion, the DOJ has concluded that there was no reason to disturb the Decrees – even when, as was the case during the Reagan administration, the DOJ was ideologically hostile to muscular antitrust enforcement. On this most recent occasion, however, the DOJ made no secret from the beginning of its negative predisposition. That was because the DOJ was not really investigating the motion picture industry or even the Paramount Consent Decrees, but was instead engaged in a vast housekeeping operation to get rid of nearly 1,300 so-called "legacy" consent decrees (decrees without "termination dates").[4] In short, the DOJ has been far less concerned about the details of the Paramount Consent Decrees themselves (or the industry they civilize), and far more concerned that the Decrees belonged to a category of consent decrees without termination dates. In multiple respects, the DOJ's hasty and inadequate treatment of the motion picture industry fails the evidentiary seriousness required to disturb fully litigated antitrust consent decrees.

---

[4]     *See generally* "Department of Justice Announces Initiative to Terminate 'Legacy' Antitrust Judgments" (April 25, 2018), available at: https://www.justice.gov/opa/pr/department-justice-announces-initiative-terminate-legacy-antitrust-judgments.

**A.      The DOJ's Inadequate Inquiry Conspicuously Ignored the "Theatre-By-Theatre" Mandate, Identified by This Court as the Heart of the Paramount Consent Decrees.**

For independents, and for this Court (that issued the Paramount Consent Decrees), "the heart of the consent judgment was the licensing injunction, prohibiting the defendants 'from licensing any feature for exhibition upon any run in any theatre in any other manner than that each license shall be offered and taken **theatre by theatre, solely upon the merits and without discrimination in favor of affiliated theatres, circuit theatres or others**.'"[5]

That declaration was a magnificent antitrust achievement. It synthesized better probably than any other single statement in cinema history the essential principle of free and fair competition in the exhibition industry. It deserves to be preserved.

Yet the DOJ's invitation to public comment altogether ignored this vital center of the Decrees, and not a single specific question posed by the DOJ directly or indirectly referenced or mentioned the "theatre-by-theatre" mandate.[6] It is a conspicuous and telling omission. Most of the specific prohibitions of the Decrees follow naturally from this essential proposition: if distributors truly license each motion picture "theatre by theatre, solely upon the merits and without discrimination in favor of affiliated theatres, circuit theatres or others," then pernicious practices such as circuit dealing, block booking and overbroad clearances would be impossible. Moreover, licensing with such meticulous fairness would blunt the anticompetitive effect of any vertical integration. In other words, this single pronouncement – expressly identified by this

---

[5]      *United States v. Loew's Inc.*, 705 F. Supp. 878, 881 (S.D.N.Y. 1988) (emphasis added) (*quoting* Warner Consent Judgment § III(8), 1950-51 CCH Trade Cas. ¶ 62,765, at 64,266; Loew's Consent Judgment § II(8), 1952-53 CCH Trade Cas. ¶ 67,228, at 67,327; Fox Consent Judgment § II(8), 1950-51 CCH Trade Cas. ¶ 62,861, at 64,546; Columbia, Universal and UA Consent Judgment § II(8), 1950-51 CCH Trade Cas. ¶ 62,573, at 63,678; Paramount Consent Judgment § II(8), 1948-49 CCH Trade Cas. ¶ 62,377, at 63,011).

[6]      *See* "The Paramount Decrees" https://www.justice.gov/atr/paramount-decree-review.

Court as the heart of the Decrees – contains in elegant miniature the entire thrust and effect of the Decrees. The fact that the DOJ declined even to inquire about the "theatre-by-theatre" mandate further exposes the inadequacy of the DOJ inquiry, such as it was, and its failure in this Court to make the requisite showing.

Significantly, by ignoring the "theatre-by-theatre" mandate, the DOJ not only ignored the heart of the Paramount Consent Decrees, but likewise thereby sidestepped any inconvenient inquiry into the remarkable extent to which the Paramount Consent Decrees have become woven into the essential fabric of the motion picture industry. For it is precisely the "theatre-by-theatre" mandate that has become such an industry mantra, widely invoked by both distributors and exhibitors, *including* players who are not technically "bound" by the Paramount Consent Decrees. For example, in Cobb Theatres antitrust litigation against AMC, concerning clearances, AMC defended itself in part by insisting that "AMC has always licensed films at these theatres on a film-by-film, theatre-by-theatre basis."[7] Nothing about "general antitrust laws" would have suggested that specific phrasing. Nor, of course, was AMC a party in the original *Paramount*

---

[7]     *See The Hollywood Reporter,* "Cobb Theatres Argues Jury Should Decide Antitrust Case Against AMC" (Nov. 7, 2016), available at https://www.hollywoodreporter.com/thr-esq/cobb-theatres-argues-jury-should-decide-antitrust-case-amc-944852: ("AMC tells the judge in a summary judgment motion that 'uncontroverted evidence disproves' the allegation that it coerced distributors into granting it exclusive licenses. Specifically, AMC says in its court papers that the distributors 'unequivocally testified that AMC never threatened or attempted to coerce them into doing anything. To the contrary, both the distributor witnesses and AMC's witnesses have sworn that AMC has always licensed films at these theatres on a film-by-film, theatre-by-theatre basis.'"); *see also* Deadline Hollywood, "Distribs & Exhibs Hold Line On Clearances Despite Fox's Position Change" (Mar. 31, 2016) ("Added Sony's distribution honcho Rory Bruer: 'We will make decisions theater by theater, picture by picture and we aren't looking to change that. It's our intention to continue to distribute our pictures on what's right for each film.'"). Available at https://deadline.com/2016/03/20th-century-fox-exhibition-clearances-circuit-dealing-1201729061/. Again, significantly, nothing in "general antitrust laws" obliged Mr. Bruer to frame his company's conduct that way. That is the continuing salutary legacy of the Paramount Consent Decrees.

litigation. For AMC (and its distributor witnesses) to frame AMC's defense that way underscores the continuing salutary and civilizing influence of the Paramount Consent Decrees.

That civilizing influence of the Paramount Consent Decrees is vital to this proceeding because it renders irrelevant many of the technical objections to continuation of the Decrees. It is true, for example, that not all current industry players are technically subject to the Paramount Consent Decrees. But that only means that these players cannot be hauled into court and cited for criminal contempt of the Decrees. These "unbound" players are nevertheless decisively influenced by the Paramount Consent Decrees. Comparable to case law from other jurisdictions, the Decrees are like "persuasive" authority; they are not "binding" on all industry players, but they usefully instruct. Thus, Disney,[8] for example, in meetings with ICA members, has reportedly assured that it licenses its movies on a "theatre-by-theatre basis without discrimination."

And why wouldn't the Paramount Consent Decrees exercise such a broadly civilizing influence? They constitute a highly particularized adjudication and application of "general" antitrust laws to this very idiosyncratic industry. Nothing in "general" antitrust law comes anywhere close to the very specifically tailored guidance of the Paramount Consent Decrees – as most elegantly encapsulated by the theatre-by-theatre mandate. And if "general antitrust laws" were truly adequate, as the DOJ weakly suggests, these particular consent decrees would never have been necessary, which remains true today. *See United States v. Loew's Inc.*, 705 F. Supp. 878, 884 (S.D.N.Y. 1988) ("These consent judgments were fashioned after years of litigation in

---

[8]    Though beyond the scope of this *amicus* brief, it warrants note that while Disney (the industry's current studio behemoth) was not a party to the original Paramount litigation, Twentieth Century Fox *was*, and Disney's recent acquisition of Fox, with full knowledge that Fox was bound by the Paramount Consent Decrees, arguably has made Disney likewise subject to the Decrees.

which this industry was shown to have a proclivity for anti-competitive behavior. If the specter of criminal prosecution and civil litigation were a sufficient prophylactic for antitrust violations, the consent judgments in this and many other cases would never have been necessary.").

The DOJ mistakenly imagines that it is only pulling at one inconsequential and very old thread when it blithely moves this Court to terminate the Paramount Consent Decrees. Instead, it threatens to unravel decades of industrial stability and innovation. Indeed, the DOJ's pointed neglect of the heart of the Paramount Consent Decrees admits only two possibilities: either the DOJ fundamentally misunderstands the Paramount Consent Decrees and accordingly has no business asking this Court to disturb them, or the DOJ simply wishes to sidestep the uniquely compelling influence of *these* Decrees, and instead treat them with the same overbroad brush it treats the many hundreds of other "legacy" consent decrees it seeks to dispatch in its housekeeping operation. Either way, the DOJ has not even meaningfully begun to treat the Paramount Consent Decrees with the evidentiary seriousness they deserve.

The remarkable history of Harkins Theatres – now the fifth largest exhibitor by box office revenue in the United States – illustrates the salutary influence of the Paramount Consent Decrees. Though now too large to qualify for ICA membership, Harkins was assuredly an "independent" in the 1970s, with eight screens at five locations in the Phoenix, Arizona market. It verged on bankruptcy because the major studios systematically favored the largest circuits over independent cinemas. Harkins filed an antitrust lawsuit in 1977, and *fifteen years later* finally successfully settled the suit. As Harkins itself described in comments to the DOJ, "[o]ne of the reasons this case succeeded was that the prohibitions set forth in the Paramount Decrees were in effect, including the requirement that each film license be offered '…solely upon the

10

merits and without discrimination in favor of affiliated theatres, circuit theatres or others."[9] The Decrees were not themselves "controlling" authority in Harkins' antitrust litigation, but the Decrees contributed clarity to antitrust jurisprudence in the *still-antitrust-abuse-inclined* motion picture industry. According to Harkins, the Paramount Consent Decrees were a substantial factor in its extraordinary rise from a small independent on the verge of bankruptcy to its modern status as a regional circuit with 515 screens and 34 locations in five states.

For independent cinemas, the "theatre by theatre" mandate is a lifeline, the continuing reason for their existence in the teeth of increasingly consolidated and powerful distribution *and* exhibition industries. To dissolve the Decrees at this moment in cinema history would declare open season on the most vulnerable players in the market and imperil access to the Big Screen for tens of thousands of Americans in small towns and rural areas.

**B. The DOJ's Mere Incantation of "Change" in the Motion Picture Industry Is No Substitute for a Factual Inquiry Into Whether Such Change Materially Eliminates the Inclination to Antitrust Abuse.**

In the announcement of its review of the Paramount Consent Decrees, and certainly in its motion and supporting memorandum to terminate the Decrees, the DOJ makes frequent reference to alleged "change" in the industry. Yet it never takes the critical next step of connecting any of that change to the structural conditions that give rise to antitrust abuse in the first place. It is as if the DOJ briefly surveyed the motion picture industry in the 1930s, then glanced again in 2019, and noticed it was different – and that's all the "evidence" it needed.

---

[9]    *See* Comments of Harkins Theatres (Oct. 4, 2018) at p.3, available at https://www.justice.gov/atr/page/file/1102441/download. Moreover, and typically of the circumstance of independents, Harkins reports that it could not have possibly afforded protracted and expensive antitrust litigation – but for the willingness of outside counsel, based upon the relative clarity contributed by the Paramount Consent Decrees, to take the case on a contingency basis.

Change, frequently tumultuous change, has been a fairly steady feature of the exhibition business since its birth. Indeed, the era following the Paramount Consent Decrees roughly coincided with the broad advent of television, perhaps the single greatest competitive threat to cinemas in their history. Cinemas survived, but the motion picture industry was changed forever. Fewer people went to cinemas and studios pivoted to fewer and more expensive motion pictures. Thus, independent exhibitors "found themselves bidding for a smaller supply of films in a more competitive market." Michael Conant, *The Paramount Decrees Reconsidered*, 44 LAW & CONTEMP. PROBS. 79, 107 (1981). But for the Paramount Consent Decrees, independents, and the small-town cinema experience generally, likely would have been crushed out of existence, and a generation of Americans would have missed the big screen. In other words, far from constituting some kind of "relic" in an industry pounded repeatedly by change, the Paramount Consent Decrees have worked steadfastly to deter anticompetitive abuse throughout all of that "change."

It should be no surprise that "change," by itself, has no bearing on the predilection of big players to engage in anticompetitive abuse. Much of the "change" touted by the DOJ is simply a *name change* among the Big Players. It has no *structural* significance. It is true, for example, that the motion picture industry is far less *vertically integrated* today than it was when the DOJ instituted the *Paramount* litigation. But it is significantly *more* concentrated and consolidated. In other words, the Big Players have different names, but the Big Squeeze on independents persists in exactly the ways it did in the 1940s. The *Open Markets* newsletter put the matter precisely:

> A DOJ decision to end the Paramount Decrees would allow major studios to buy up theater chains and impose the same anticompetitive practices on filmmakers and consumers barred 70 years ago. More troubling is that this would come at a time of increased concentration in the studio, movie theater, and online distribution markets. Disney's recent purchase of 20th Century Fox means that four corporations now control 75 percent of the movie production business. In theaters, three firms now control 60

12

percent of the domestic market. Online, two companies dominate the streaming market, where 30 percent of consumers report using Amazon Prime Video and 50 percent report using Netflix as of 2017.

\* \* \*

In announcing the plan to review the Paramount consent decrees, Assistant Attorney General for Antitrust Makan Delrahim said that 'much has changed in the motion picture industry since' the Paramount Decrees. That's true. In many key respects, the film industry is more concentrated now than it was in 1948.

Open Markets newsletter, "Lights, Camera, Monopoly: DOJ Could Revive the Studio System" (Aug. 24, 2018).[10] The primary beneficiaries of the Decrees – independent cinemas and their patrons – do not need protection specifically from "vertical integration." They need protection from anticompetitive abuse by *all* players with market power and a natural tendency to exploit it. That means the distribution oligopoly *and* the exhibition oligopoly *and* the looming streaming oligopoly.

Put another way, the DOJ seems to take it as relevant to this proceeding that the motion picture industry is unlikely to become as vertically integrated as it was in the 1940s, when in fact it *should* be alarmed at the increasing concentration and consolidation in the industry. Vertical integration, as now widely recognized, *can* produce efficiencies and benefit consumers. But steadily increasing concentration and consolidation in an industry is never pro-competitive. As the Brookings Institute noted in a report[11] concerning some competitive alarm bells in the economy:

> A breakdown in the competitive process is also demonstrated by today's lackluster start up activity. U.S. startup formation rates have fallen dramatically over the last thirty years and among startups that are formed, more are failing compared to previous

---

[10]    Available at https://openmarketsinstitute.org/newsletters/corner-newsletter-august-23-2018-paramount-consent-decrees-matter-tech-giants-threaten-banking-overlooked-dissent-ftc/

[11]    W.A. Galston & C. Hendrickson, *A policy at peace with itself: Antitrust remedies for our concentrated, uncompetitive economy*, Brookings Institute (Jan. 5, 2018), available at: https://www.brookings.edu/research/a-policy-at-peace-with-itself-antitrust-remedies-for-our-concentrated-uncompetitive-economy/

decades. This shift suggests start ups today are encountering barriers to entry and researchers find that consolidation helps explain the widespread fall in firm formation rates across economic sectors and geographic areas.

Combined with *more* concentrated distribution, and *more* concentrated exhibition, the advent of Big Streaming makes the Paramount Consent Decrees so much *more* relevant to the "changing" motion picture industry. Streaming services with massive market power are the new, potentially scarier, "television." If they purchase cinemas, and throw around their ample weight, independent cinemas confront the predations of Big Distribution, Big Exhibition, *and* Big Streaming. On the other hand, if the Paramount Consent Decrees continue to be respected, the entry of behemoths like Amazon into the exhibition business would more likely be on terms that deterred Amazon from abusing its market power either to favor its own cinemas with its content or to punish fairly competing exhibitors with terms such as overbroad clearances.

It is not "vertical integration" that produces the predilection for anticompetitive abuse, but the peculiar and inherent uncertainties in the motion picture industry. As Michael Conant explained, "[t]he final product is not homogeneous, but is constantly changing, and market uncertainty is greater than in most industries. Consumer reaction to any particular film is unpredictable. The search for security—for protection against market uncertainty—gave the greatest impetus to combination and concerted market control in the industry." M. Conant, *Antitrust in the Motion Picture Industry: Economic and Legal Analysis* (Univ. of Cal. Press 1960) at p.1. This peculiar uncertainty is no less pronounced today than it was in the 1940s. Movies then, and movies now, constantly surprise expectations, positive and negative. The consequent scramble for predictability yields the same anticompetitive temptations now as then. That is precisely why the Paramount Consent Decrees have a timeless relevance: they counter the inevitable temptation, by any player with market power, to build more certainty into the game.

14

It warrants note that the relevant product market for consideration of the Paramount Consent Decrees is major first-run motion pictures in a scheme of tiered entertainment. Cinemas occupy the top rung of tiered entertainment, and box office revenue typically drives the value of motion pictures in all subsequent platforms. In other words, the industry acquires the predictability it craves *after* the more unpredictable experience with box office revenues. That is why the temptation to anticompetitive conduct is most pronounced at the top of the tiered entertainment scheme, where the unpredictability (and often the financial stake) is greatest. As against this steady persistence of industry uncertainty, the "changes" touted by the DOJ are barely relevant.

The experience of digital cinema – perhaps the most dramatic recent change in the motion picture industry – illustrates the persistence of anticompetitive temptation in the teeth of "change," even given the great promise of pro-consumer benefits. At its inception, digital cinema's most obvious benefit was the vastly easier distribution of motion pictures at a fraction of the cost (there being no $1,500 cumbersome celluloid print involved).[12] Widely-released motion pictures could therefore, it was assumed, more easily and more widely get into the hands of independents in small markets. But the results so far are decidedly mixed.

Too often, ICA members still experience obstacles to availability. Finite celluloid prints often constituted a convincing excuse. Digital "prints" eliminate that excuse. The more common

---

[12]    H. Alexander and R. Blakely, "The Triumph of Digital Will Be the Death of Many Movies," *The New Republic* (Sep. 12, 2014) https://newrepublic.com/article/119431/how-digital-cinema-took-over-35mm-film ("Yet the real opportunity to axe costs digitally comes long after the final scene is shot. To produce and ship a 35mm print to an American cinema costs about $1,500. Multiply that by, say, 5,000 prints for a big movie and it comes to $7.5 million. Digital formats can do the same job for 90 percent less.").

explanation now typically involves invocation of some "marketing plan" – one that presumably

contemplates a *lower* gross for a major motion picture's opening weekend?[13]

Some of the reluctance to widen the availability of major motion pictures can possibly be

attributed to "virtual print fees," the arrangements whereby distributors pay exhibitors a certain

sum upon booking a motion picture to subsidize purchase of digital equipment and pass on some

of the savings reaped by distributors.[14] But here is the strangeness, and the reason why it is a

delicate stage in our industry's history. The era of virtual print fees is coming to a close. Many

independents have already concluded their virtual print fee arrangements with distributors, and

yet they *still* report inexplicable motion picture availability problems.

What is happening? We cannot yet be certain, but it is a fixture of antitrust law that when

players leave money on the table or otherwise act contrary to self-interest, antitrust conspiracies

may be much more readily inferred.[15] Are overbroad clearances to blame for the difficulty

---

[13]     Even in the pre-*Paramount* period, it was recognized that "multiple first runs" (as opposed to default exclusivity arrangements) increased total revenue. Michael Conant, *Antitrust in the Motion Picture Industry: Economic and Legal Analysis* at 65 & n.20 (Univ. of Cal. Press 1960).

[14]     *See* Wikipedia, the Free Encyclopedia, "Virtual Print Fee," at https://en.wikipedia.org/wiki/Virtual_Print_Fee (last visited Jan 16, 2020):

    **Virtual Print Fee** (VPF) is a subsidy paid by a film distributor towards the purchase of digital cinema projection equipment for use by a film exhibitor in the presentation of first release motion pictures. The subsidy is paid in the form of a fee per booking of a movie, intended to match the savings that occurs by not shipping a film print. The model is designed to help redistribute the savings realized by studios when using digital distribution instead of film print distribution.

[15]     *See Regal Entm't Grp. v. Ipic-Gold Class Entm't, LLC*, 507 S.W.3d 337, 350 (Tex. App. 2016) ("The evidence that Regal and half of the major film distributors acted contrary to their self-interest is what permits a rational inference of conspiracy or coercion as opposed to permissible independent conduct.") (*citing Admiral Theatre Corp. v. Douglas Theatre Co.*, 585 F.2d 877, 884 (8th Cir. 1978) (when conduct is inconsistent with self-interest of actors, were they acting alone, agreement may be inferred solely from action)); *see also Cobb Theatres III, LLC v. AMC Entmt. Holdings, Inc.*, 101 F.Supp.3d 1319, 1331 (N.D. Ga. 2015) (noting that most conspiracies are inferred from behavior of

independents are experiencing with film availability? Clearances are analyzed under the rule of reason, which makes proving them and their specific anticompetitive effects a dense and difficult undertaking. But it would send a terrible signal at this delicate and dynamic moment to dissolve the most eloquent expression of free and fair competition in the motion picture industry.

### C.   The Paramount Consent Decrees Call for None of the Scrutiny Sometimes Associated With Collusive and Other Problematic Consent Decrees.

The Paramount Consent Decrees are a special case. They issued only after *abundant* litigation[16] and wide-ranging findings of guilt. *See United States v. Loew's Inc.*, 705 F. Supp. 878, 881 (S.D.N.Y. 1988) ("Because this case was actually litigated, the judgments are not consent decrees in the traditional sense. Only the details of relief were negotiated and entered by consent, findings of guilt having been entered and upheld.").

Moreover, the Supreme Court remand did not undo the key factual findings by the district court. The Supreme Court affirmed the findings, and indeed remarked not once, but *twice* on the defendants' proclivity for unlawful conduct. *See Paramount*, 334 U.S. at 147 (noting studio defendants' "proclivity to unlawful conduct"); *id.* at 148 (noting that distributors had "shown such a marked proclivity for unlawful conduct"). The Supreme Court "affirmed in part and reversed in part" only because the Court quibbled with one *remedy* of mandatory competitive

---

alleged conspirators and denying motion to dismiss restraint-of-trade claim where premium theater alleged that megaplex requested clearance, implicitly threatening economic harm if distributors did not accede, and premium theater subsequently received fewer films).

16      *United States v. Paramount Pictures, Inc.*, 66 F. Supp. 323 (S.D.N.Y. 1946), *aff'd in part and rev'd in part*, 334 U.S. 131 (1948), *on remand*, 85 F. Supp. 881 (S.D.N.Y. 1949), *aff'd*, 339 U.S. 984 (1950).

bidding, *not* any findings of fault. It therefore cannot be said that the Consent Decrees rested in

any sense upon findings that had been undone, questioned or reversed on appeal.[17]

Furthermore, the Paramount Consent Decrees pose none of the problems and perpetuate

none of the mischiefs associated with overzealous employment of consent decrees.[18] The

Paramount Consent Decrees are not an example of an agency seeking to short-circuit traditional

rulemaking procedures, or two parties colluding to effect "regulation" by consent decree, or one

administration seeking to limit the policy discretion of a future administration, or an arrogation

of excessive judicial power and excessive judicial involvement in on-going policy matters.

Indeed, the Supreme Court disagreed with the district court as to the remedy of mandatory

competitive bidding precisely because the Court believed such a remedy might excessively

entangle the judiciary in on-going industry activity. The Department of Justice filed and fully

litigated one of the most significant antitrust lawsuits in the 20th century, obtained detailed

findings, and negotiated appropriate remedies in the form now known as the Paramount Consent

Decrees. The passage of decades has not dimmed their relevance.

---

[17]     *See Don George, Inc. v. Paramount Pictures*, 111 F. Supp. 458, 467 (W.D. La. 1951)
("Under the circumstances of the remand, it will not do to say that the Supreme Court
granted the defendants a new trial as the defendants contend, since it must be borne in
mind that the judgment was affirmed in part, that is, as to many findings of fact and
conclusions of law with reference to violations of the antitrust laws by the defendants and
reversed in part but the reversal was made largely to enable the district court to solve the
problem of divestiture. It appears that in order to give third parties, such as plaintiffs
herein, the benefit of pleading the consent decrees for use as prima-facie evidence a
careful distinction was made in the consent decrees between issues which had been
closed by the decision of the Supreme Court and issues such as the problem of divestiture
which were left open for determination by the District Court on remand.").

[18]     *See generally* Andrew Grossman, Former Visiting Fellow, American Heritage
Foundation, *Use and Abuse of Consent Decrees in Federal Rulemaking*, Testimony
before the Subcommittee on the Courts, Commercial and Administrative Law,
Committee on the Judiciary, United States House of Representatives (February 3, 2012),
available at https://www.heritage.org/testimony/use-and-abuse-consent-decrees-federal-rulemaking.

18

Indeed, the ICA submits respectfully that not a single mischief can be legitimately cited from perpetuation of the Paramount Consent Decrees. It is certainly true that antitrust law has evolved since the 1940s. For example, vertical arrangements are viewed more benignly now than they were in the 1940s. But that is not to say that the Paramount Consent Decrees are perpetuating "bad law." The salutary effect of the Paramount Consent Decrees is not their perfect recitation of all modern antitrust principles, but their expression of certain timeless guides for fair conduct in an industry inclined to misbehave, especially the "theatre-by-theatre" mandate.

This DOJ reaches a different conclusion from all of its predecessors only because of its formulaic focus on "legacy" decrees. It therefore attributes misdirected significance to the fact that the Paramount Consent Decrees contain no "termination date." Significantly, however, the 1930s and 40s DOJ fully knew how to execute consent decrees with termination dates. Indeed, in the midst of the Paramount litigation, the Department of Justice tried a consent decree in 1940 with a three-year expiration date. *United States v. Paramount Pictures, Inc.*, 1940-1943 Trade Cas. (CCH) ¶ 56,072 (S.D.N.Y. 1940). **It did not work**. The litigation was reactivated, the defendants were all convicted of major antitrust violations, and the civilizing Paramount Consent Decrees ensued – **quite deliberately** without an expiration date. *See generally* K. Fox, *Paramount Revisited: The Resurgence of Vertical Integration in the Motion Picture Industry*, 21 Hofstra L.R. 505 (1992) (available at: http://scholarlycommons.law.hofstra.edu/hlr/vol21/iss2/6).

## CONCLUSION

Termination of the Paramount Consent Decrees would be not only misdirected policy, but terrible timing. This is not the moment to untether big distributors (or other behemoth content providers) or even to hint that some "testing the waters" or "pushing the anticompetitive envelope" might be okay. This is not the moment to tempt big players into the kinds of

19

predations that are difficult to detect and prohibitively expensive to litigate. Independents already dwell in a kind of perpetual existential angst, and the economic challenges of running a cinema continue to mount. It is difficult to navigate these waters. Independents need to see a steadfast commitment to the principles of fairness so succinctly embodied in the Paramount Consent Decrees, *especially* the "theatre-by-theatre on the merits" mandate.

Independents are robust competitors. The ICA is not merely peddling sympathy for a victim class. But they are the most vulnerable players in an industry increasingly dominated by *very* big players. And their disappearance would have a terrible impact on the industry and on mostly rural and small-town patrons who would probably never again watch a movie on the Big Screen.

The ICA therefore respectfully requests that the Court maintain its Paramount Consent Decrees in place, deny the DOJ's motion to terminate them, and at a minimum, order a larger factual inquiry and require the DOJ to make the serious evidentiary showing it failed to do with its current motion.

January 17, 2020

Respectfully submitted,

G. Kendrick Macdowell
Counsel, Independent Cinema Alliance
D.C. Bar No. 436375
(214) 782-9985
kendrick27@yahoo.com

James J. Mahon
Becker & Poliakoff LLP
Local Counsel for ICA
45 Broadway
17th Floor
New York, New York 10006
(212) 599-3322
Jmahon@beckerlawyers.com