**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 1:19-mc-00544-AT |
| Plaintiff, | |
| v. | |
| PARAMOUNT PICTURES, INC., | |
| Defendant. | |
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | |
| LOEW'S INCORPORATED, ET AL., | |
| Defendants. | |

**BRIEF OF *AMICUS CURIAE***
**THE NATIONAL ASSOCIATION OF THEATRE OWNERS**
**REGARDING PLAINTIFF'S MOTION TO TERMINATE**

## TABLE OF CONTENTS

Page

I.  INTRODUCTION, INTEREST OF *AMICUS CURIAE*, AND BACKGROUND..............1

II.  THE GOVERNMENT MISSTATES THE LEGAL STANDARD ...................................1

    A.  The Key Question Is Not Whether the Specific Conduct that Underlay the Decrees Will Recur, but Whether Termination Benefits the Public Interest..........2

    B.  The Government's Cursory Analysis Does Not Establish that Termination Would Benefit the Public Interest...........................................................................4

III.  THE GOVERNMENT FAILED TO PROVE THAT A REPEAL ON BLOCK BOOKING IS IN THE PUBLIC INTEREST ...................................................................10

    A.  The Ban on Block Booking Contributes to A Thriving Theatrical Exhibition and Distribution Market........................................................................12

    B.  The Prohibition on Block Booking Serves the Public Interest .............................14

IV.  CONCLUSION...................................................................................................................20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*Leecan v. Lopes*,
    893 F.2d 1434 (2d Cir. 1990)...................................................................................4

*United States v. ABA*,
    118 F.3d 776 (D.C. Cir. 1997) ................................................................................7

*United States v. American Cyanamid Co.*,
    719 F.2d 558 (2d Cir. 1983)..........................................................................2, 3, 5

*United States v. Columbia Artists Mgmt., Inc.*,
    662 F. Supp. 865 (S.D.N.Y. 1987) .........................................................................6

*United States v. Eastman Kodak Co.*,
    63 F.3d 95 (2d Cir. 1995)..............................................................................7, 8, 9

*United States v. IBM*,
    163 F.3d 737 (2d Cir. 1998)........................................................................3, 4, 5, 9

*United States v. Loew's, Inc.*,
    783 F. Supp. 211 (S.D.N.Y. 1992) .....................................................................5, 6

*United States v. Loew's, Inc.*,
    882 F.2d 29 (2d Cir. 1989)..............................................................................2, 6, 7

*United States v. Paramount Pictures, Inc.*,
    334 U.S. 131 (1948)...............................................................................................12

*United States v. SBC Comms., Inc.*,
    489 F. Supp. 2d 1 (D.D.C. 2007) ...........................................................................7

*United States v. Western Electric Co.*,
    900 F.2d 283 (D.C. Cir. 1990)............................................................................6, 7

*United States v. Western Electric Co.*,
    993 F.2d 1572 (D.C. Cir. 1993)..............................................................................6

### STATUTES

15 U.S.C. § 16.................................................................................................................7

15 U.S.C. § 16(b) ...........................................................................................................6

# OTHER AUTHORITIES

Amy Novotney, *Social Isolation: It Could Kill You*, 50(2) Am. Psychol. Ass'n 34,
(May 20, 2019)...................................................................................................19

Art House Convergence, *AHC National Audience Study 2018* (Jan. 22, 2018),
https://www.arthouseconvergence.org/wp-content/uploads/2019/05/AHC-
2018-National-Audience-Study-FINAL-REPORT.pdf....................................18, 19

Benjamin Klein Biography, U.S. Dep't of Justice, Antitrust Div.,
https://www.justice.gov/atr/ benjamin-klein-biography (last updated Jun. 25,
2015) ....................................................................................................................5

Dino Ray-Ramos, *Specialty Box Office 2019: Focus Features, A24, Roadside
Attractions And Neon Lead Way*, DEADLINE (Jan. 3, 2020),
https://deadline.com/2020/01/specialty-box-office-2019-winners-studios-top-
movies-120281953 6.......................................................................................13, 14

Emily Flynn, *Discovering Audience Motivations Behind Movie Theater
Attendance*, 9(2) Elon J. of Undergraduate Res. in Commc'ns 94 (Fall 2018) .....................18

Eric Kohn, *Christopher Nolan: I Won't Work With Netflix Because Their Film
Strategy is 'Pointless'*, INDIEWIRE (July 19, 2017),
https://www.indiewire.com/2017/07/christopher-nolan-interview-dunkirk-
netflix-1201857101 ............................................................................................15

Erich Schwartzel, *These 11 People Watch Every Movie, Especially the Gross Bits*,
THE WALL ST. J. (June 2, 2017), https://www.wsj.com/articles/destroy-earth-
just-dont-smoke-how-hollywood-decides-whats-acceptable-
1496422644?mg=prod/com-wsj ........................................................................14

Ernst & Young, *The Relationship Between Movie Theatre Attendance and
Streaming Behavior: Survey Insights* (Apr. 24, 2018),
https://www.natoonline.org/wp-content/uploads/2018/04/Ernst-Young-
Survey-Analysis-4-24-2018.pdf..........................................................................18

Jessica Rawden, *Director Jon M. Chu Credits Movie Theaters For Crazy Rich
Asians' Success*, CINEMABLEND (Apr. 5, 2019),
https://www.cinemablend.com/news/2469893/director-jon-m-chu-credits-
movie-theaters-for-crazy-rich-asians-success.....................................................16

Joanna Rothkopf, *A Journey Into the Righteous, Risk-Averse World of Faith-
Based Films*, JEZEBEL: THE MUSE (June 4, 2018),
https://themuse.jezebel.com/a-journey-into-the-righteous-risk-averse-world-
of-fait-1825210009 ............................................................................................15

Jordan Peele (@JordanPeele), TWITTER (Mar. 2, 2017, 6:03 PM),
https://twitter.com/jordanpeele/status/837483509216247808?lang=en .................16

Martin Scorcese, *Martin Scorsese: I Said Marvel Movies Aren't Cinema. Let Me Explain*, N.Y. TIMES: OPINION (Nov. 4, 2019), https://www.nytimes.com/2019/11/04/opinion/martin-scorsese-marvel.html .......................17

Mike Ryan, *Steve McQueen On 'Widows' And Why He Ignored A 'Warning' That An Actor Was 'Difficult' To Work With*, UPROXX (Sept. 11, 2018), https://uproxx.com/movies/steve-mcqueen-interview-widows-michelle-rodriguez/ .................................................................................................................................16

Miriam Kreinin Souccar, *The Indie-Film Boom is Fueling a Rise in Art-House Theaters*, CRAIN'S NEW YORK BUSINESS (Sept. 25, 2017) ....................................................19

Motion Picture Association of America, 2018 Theme Report, 36 (2018), https://www.motionpictures.org/wp-content/uploads/2019/03/MPAA-THEME-Report-2018.pdf................................................................................................18, 19

*The Paramount Decrees*, U.S. DEP'T OF JUSTICE, https://www.justice.gov/atr/paramount-decree-review (last updated Oct. 30, 2018) ...........................................................................................................................................13

Rebecca Rubin, *Global Box Office Hits New Record in 2019 With $42.5 Billion*, VARIETY (Jan. 10, 2020), https://variety.com/2020/film/box-office/box-office-us-misses-record-disney-dominates-1203453 752/ ...............................................................10

Ryan Lattanzio, *'Marriage Story' Director Noah Baumbach Stresses Value of Theatrical Experience and Praises 'E.T.'*, INDIEWIRE (Nov. 10, 2019), https://www.indiewire.com/2019/11/noah-baumbach-marriage-story-netflix-theatrical-experience-1202188566/.........................................................................................16

Thomas K. Arnold, *Digital Lifted Consumer Home Entertainment Spending to Record Heights in 2019*, MEDIAPLAYNEWS (Jan. 13, 2020), https://www.mediaplaynews.com/digital-lifted-consumer-home-entertainment-spending-to-record-heights-2019/ .................................................19

U.S. DEP'T OF JUSTICE, ANTITRUST DIV. MANUAL III-149 (5th Ed. Mar. 2014), available at https://www.justice.gov/atr/file/761166/download ..................................................6

U.S. DEP'T OF JUSTICE, ANTITRUST DIV. MANUAL IV-51 (5th Ed. Mar. 2014), https://www.justice.gov/atr/file/761166/download....................................................................7

U.S. Dep't of Justice, *Dep't of Justice Announces Initiative to Terminate "Legacy" Antitrust Judgments* (Apr. 25, 2018), https://www.justice.gov/opa/pr/department-justice-announces-initiative-terminate-legacy-antitrust-judgments .........................................................................................2

U.S. Dep't of Justice, *Judgment Termination Initiative: New York, Southern District,* https://www.justice.gov/atr/judgment-termination-initiative-new-york-southern-district (last visited Jan. 15, 2019) ...................................................................2

*Waves Writer/Director/Producer Trey Edward Shults On Why The Theatrical vs. Streaming Debate Makes Him Want To 'Double Down' On Making Films For Cinemas*, CINEMABLEND (Nov. 13, 2019), https://www.cinemablend.com/news/2484695/waves-writerdirectorproducer-trey-edward-shults-on-why-the-theatrical-vs-streaming-debate-makes-him-want-to-double-down-on-making-films-for-cinemas ............................................................15

Zack Sharf, *Helen Mirren Speaks Out Against Netflix: 'It's Devastating for Film Directors'*, INDIEWIRE (Apr. 13, 2018), https://www.indiewire.com/2018/04/helen-mirren-netflix-devastating-film-directors-1201952316/ ...........................................................................................................16

## I.      INTRODUCTION, INTEREST OF *AMICUS CURIAE*, AND BACKGROUND

Pursuant to this Court's December 23, 2019 Order (ECF No. 39), *Amicus Curiae* the National Organization of Theatre Owners ("NATO") submits this brief concerning the Government's Motion for an Order Terminating Antitrust Judgments (ECF No. 2, the "Motion"). NATO's interests in this matter are set forth in its letter to the Court seeking leave to file this *amicus* brief (ECF No. 36), and the general procedural history of the *Paramount* Decrees is set forth in the Motion at 6-12.[1]

NATO submits that (1) the Government has misstated the legal standard that applies to the termination of consent decrees and (2) the block-booking provisions of the *Paramount* Decrees should be preserved. Section II of this brief addresses the legal standard, and Section III addresses block booking. In addition, on October 1, 2018, NATO submitted to the Government a 20-page comment regarding the *Paramount* Decrees' provisions on block booking. Because Section III cites to that comment (which expands on some of the points made herein), NATO has included it as Exhibit A to this brief, but does so solely for the Court's convenience and reference, as the arguments and points in Section III are self-contained.

## II.     THE GOVERNMENT MISSTATES THE LEGAL STANDARD

The Government misstates the standard applicable to the termination of antitrust consent decrees in two significant respects. First, and most egregiously, the Government repeatedly suggests that if the specific violations that gave rise to a consent decree subsequently have been cured, then termination is appropriate. That is emphatically not the law. Second, the Government shrinks the proper inquiry—*i.e.*, whether termination will benefit the public interest—into a

---

[1]      Capitalized terms not defined herein have the meaning ascribed to them in the Motion. NATO's reference to the Motion's overview of the *Paramount* Decrees' procedural history is not an endorsement of any factual contentions or legal arguments offered therein in support of terminating the Decrees today.

shadow of its real substance. Strikingly, the Motion does not rely on any evidence the Government *itself* has adduced, but on the supposed failure of *non-parties* to prove that the public interest will be harmed by the rescission of regulatory architecture that has been in place for more than seventy years. The true standard is not that featherlight, and by aiming for such an artificially low bar, the Government has failed to meet its burden.

This Motion does not exist in a vacuum. The Department of Justice is currently undertaking a review of over 1,300 legacy antitrust judgments, which includes over 200 judgments in the Southern District of New York alone.[2] The burden-shifting and evidence-eliminating standard proposed by the Government therefore harms not only the *Paramount* stakeholders, but also those impacted by the other judgments under review now or in the future. This type of sweeping reappraisal of consent decrees is unprecedented in this Court, and adopting an accurate standard of review is critical to ensuring a fair process not just here, but with respect to the other similar motions that the Government might bring.

A.  **The Key Question Is Not Whether the Specific Conduct that Underlay the Decrees Will Recur, but Whether Termination Benefits the Public Interest**

Termination of a consent decree is appropriate only where the evidence demonstrates that the termination would benefit the public interest. *See, e.g.*, *United States v. American Cyanamid Co.*, 719 F.2d 558, 565 (2d Cir. 1983); *see also United States v. Loew's, Inc.*, 882 F.2d 29, 33 (2d Cir. 1989) ("In order to protect the public interest the district court properly examined [a] motion [to modify a *Paramount* Decree] with great care[.]"). The Second Circuit has squarely held that an end to the specific conduct underlying a consent decree is not, in itself, sufficient grounds for the

---

[2]     *See* U.S. Dep't of Justice, *Dep't of Justice Announces Initiative to Terminate "Legacy" Antitrust Judgments* (Apr. 25, 2018), https://www.justice.gov/opa/pr/department-justice-announces-initiative-terminate-legacy-antitrust-judgments; U.S. Dep't of Justice, *Judgment Termination Initiative: New York, Southern District,* https://www.justice.gov/atr/judgment-termination-initiative-new-york-southern-district (last visited Jan. 15, 2019).

decree to be terminated. Specifically, in *American Cyanamid*, the Second Circuit reversed a district court's ruling that was based on a "deferr[al] to the judgment of the Department of Justice" that a decree was no longer needed because the concerns that had initially animated the entry of the decree no longer persisted. 719 F.2d at 566.  Lacking "the benefit of an analysis of record data regarding such factors as the level of concentration, barriers to entry, scale economies, minimum efficient scale, or collusion[,]" or other evidentiary factors discussed in the Antitrust Division's official guidelines, the Second Circuit held that a court may not rubber-stamp the Executive Branch's current view that a longstanding decree has been outmoded. *Id.* at 567. Accordingly, the Court of Appeals "reverse[d] the decision of the district court insofar as it holds that 'the conditions which the decree was designed to remedy no longer exist'" and remanded "to make findings of fact as to the current state of the [relevant] market[s]," among others things. *Id.*

Nevertheless, throughout its Motion, the Government directs the Court to a supposedly "key" or "critical" test that the Second Circuit has expressly disapproved. Specifically, in the Government's words, "the key question for this motion" is whether "Defendants would collude to re-impose uniform distribution and licensing schemes on movie theaters." *See* Motion at 5. In its repeated suggestions that this Court should limit its review to the likelihood of a return to the specific practices of a prewar Hollywood cartel, the Government ignores the relevant passage from *American Cyanamid*, and is therefore unable to cite any authority to support that view. Indeed, with one exception—where it cites *United States v. IBM*, 163 F.3d 737 (2d Cir. 1998)—the Government cites no authority *at all* on this point.[3] But *IBM* did not endorse the Government's

---

[3]    *Compare* Motion at 5 *with id.* at 3 ("For purposes of this motion, the question is whether the antitrust violations that the Decrees remedied would reoccur if the Decrees are terminated[,]" *i.e.*, whether "Defendants would or could re-establish the industry-wide horizontal conspiracy or cartel that was the basis for the original enforcement action[.]") (citing no authority); *id.* at 30 ("Critically for this motion, not one of the comments establishes that there is a likelihood that the remaining Paramount Defendants would again collude to impose an anticompetitive distribution

"specific practices" test (and had no authority to do so).[4] Rather, it affirmed the district court's finding, after review of a lengthy record, that the defendant in that case had no plans or propensity to "actually tie[] the sale of the two products" at issue, thereby negating an essential element of a tying claim. *IBM*, 163 F.3d at 741.

The focus of the *IBM* court was therefore on the *elements* of the underlying antitrust offense, not on the specific historical practices that had satisfied those elements decades before. Indeed, the product lines at issue in *IBM* did not even exist at the time the relevant decree had been entered, but the court still sorted through the evidence relating to "actual tying" as part of its "forward-looking and probabilistic" analysis. *IBM*, 163 F.3d at 739 & n.2, 741. And although an "elements test" would not support the Government in any event—because the Motion fails to articulate and analyze the elements of the many Sherman Act offenses underlying the Decrees— that is not even the test. *IBM* itself expressly noted that "other factors" beyond the elements "could additionally be considered" because the fundamental inquiry is whether "termination will serve the 'public interest.'" *Id.* at 740 & n. 4, 738. Accordingly, the Government's alternative "specific practices" standard is unsupported and contradicted by law.

### B. The Government's Cursory Analysis Does Not Establish that Termination Would Benefit the Public Interest

The Government's approach to the legal standard also fails to address or support its evidentiary burden. Although it acknowledges the rule that a court must find termination to be "consistent with the public interest" (*see* Motion at 14), in practice, the Motion treats that question

---

system or anticompetitive terms in their theatrical film licensing agreements.") (same); *id.* at 32 ("As an initial matter, for purposes of this motion, the question is not whether a Defendant's unilateral imposition of a specific licensing term, like block booking or circuit dealing, would be illegal, but whether absent the Decrees, Defendants would illegally collude to impose standard distribution or licensing terms in their movie theatre agreements.") (same).

[4]       The *IBM* court was bound by *American Cyanamid*, and had no power to develop a rule that case flatly foreclosed. *See, e.g.*, *Leecan v. Lopes*, 893 F.2d 1434, 1443 (2d Cir. 1990).

as entirely dependent on the Government's say-so—the same error committed by the district court in *American Cyanamid*. *See* 719 F.2d at 567. According to the Motion, all the Government need do to meet its burden is "provide[] a reasonable explanation to support the conclusion that termination is consistent with the public interest." *See* Motion at 14. Notably, the Government abjures any need for that explanation to be supported by an evidentiary hearing—or by any evidence at all. *See id.* at n.15. Thus, at bottom, the Government contends that the Motion can be denied only if the arguments articulated in its memorandum are unreasonable on their face.

That toothless standard finds no support in the Second Circuit case law on the termination of consent decrees. Courts in this circuit consistently require and review *evidence* of the real-world effects that are likely to result from termination of a consent decree. That is true even in the cases on which the Government relies. *See* Motion at 14-15 (collecting cases). In *IBM*, the Government's "detailed investigation included the review of more than 100,000 pages of IBM documents, including its strategic business plans, and interviews with IBM's customers, competitors, and executives." *IBM*, 163 F.3d at 739. In *American Cyanamid*, as noted above, the Second Circuit rejected the district court's deferral to the Government's conclusions and remanded for factfinding. *American Cyanamid*, 719 F.2d at 566-67. In *United States v. Loew's, Inc.*, 783 F. Supp. 211, 214 (S.D.N.Y. 1992), the defendant accompanied its motion with supporting evidence in the form of affidavits from a top company executive and a renowned economist, and the Government offered evidence of a proposed joint venture that "raised no apparent competitive concerns," but "had to be abandoned" because of a *Paramount* Decree.[5] Similar evidence was offered in the Second

---

[5]  *See* Affidavits of A. Alan Friedberg and Benjamin Klein, *United States v. Loew's, Inc.*, 783 F. Supp. 211 (S.D.N.Y. 1992) (No. 1:89-cv-06159-WCC). Mr. Friedberg was the chairman of Loew's at the time, and Benjamin Klein, in the Government's words, "is an internationally recognized expert on antitrust economics" and Professor Emeritus of Economics at UCLA. *See* Benjamin Klein Biography, U.S. Dep't of Justice, Antitrust Div., https://www.justice.gov/atr/benjamin-klein-biography (last updated Jun. 25, 2015).

Circuit's *Loew's* case, which involved a different modification to one of the *Paramount* Decrees. *See Loew's*, 882 F.2d at 31 (referencing affidavits from executives, an expert economist, and a former "government attorney responsible for the enforcement" of the Decrees).[6]

The Government's own standards demand nothing less. According to the Antitrust Division Manual, "even when [the Government] believed that [a] decree should be presumptively terminated," it still has "routinely conducted a full investigation into possible changes in the market or law." *See* U.S. DEPT. OF JUSTICE, ANTITRUST DIV. MANUAL III-149 (5th Ed. Mar. 2014), available at https://www.justice.gov/atr/file/761166/download.[7] Such an investigation should, at a minimum, match the lengths to which the Government goes when *entering*, rather than ending, a consent decree. *See, e.g.*, *Loew's*, 783 F. Supp. at 213 (noting that "the same standard" applies at entry as at termination); *United States v. Columbia Artists Mgmt., Inc.*, 662 F. Supp. 865, 869 (S.D.N.Y. 1987) (same); *see also* Motion at 15 (citing *id.*). And although the Government argues that an "evidentiary hearing" is not required before a court can enter a consent decree (*see* Motion at n.15), that is a far cry from demonstrating that no *evidence* is necessary. In fact, federal law expressly envisions that the Government will publicly file, along with a proposed decree, "any other materials and documents which the United States considered determinative in formulating such proposal." 15 U.S.C. § 16(b). The paradigm "determinative document" is "a report prepared

---

[6]    The Motion (at 15) also cites the out-of-circuit cases of *United States v. Western Electric Co.*, 993 F.2d 1572, 1576-77 (D.C. Cir. 1993) and *United States v. Western Electric Co.*, 900 F.2d 283, 307 (D.C. Cir. 1990). Those cases do not support the Government's no-evidence approach here; in *Western Electric*, "[t]he DOJ hired an independent consultant . . . to conduct in-depth research on the telecommunications industry as a whole as well as on each of the relevant submarkets." 900 F.2d at 291; *see also Western Electric*, 993 F.2d at 1578 ("[P]articipants on all sides of the dispute submitted affidavits on these [economic] issues, many by very distinguished economists."). 993 F.2d at 1578. In addition, the D.C. Circuit emphasized that "abject deference to the Department [of Justice]" is not appropriate in this posture. *Id.* at 1576.

[7]    Nor is any presumption in favor of termination appropriate where there is "longstanding reliance by industry participants on the decree." *Id.*

for the Antitrust Division by an outside consultant analyzing the economic consequences" of a proposed antitrust remedy. *See United States v. ABA*, 118 F.3d 776, 784 (D.C. Cir. 1997).[8] Such a report was present in the Second Circuit's *Loew's* case, and in the D.C. Circuit *Western Electric* cases cited in the Motion—but is conspicuously absent here. *See Loew's*, 882 F.2d at 31; *Western Electric*, 900 F.2d at 291.

Instead of proffering and analyzing evidence or otherwise presenting a record, the Government shifts the burden to commenters and the public at large—that is, *non-parties*—to "establish that the current antitrust laws are inadequate to police [anticompetitive] collusion." Motion at 30. That is clearly inconsistent with the law: it is always the "party seeking to modify or terminate a consent decree [that] 'bears the burden of establishing that a significant change in circumstances warrants revision of the decree[.]'" *United States v. Eastman Kodak Co.*, 63 F.3d 95, 101 (2d Cir. 1995). There is no presumption in favor of changed circumstances; they must be *proven. See id.* at 102 ("[A]s a general matter, we believe that an antitrust defendant should not be relieved of the restrictions that it voluntarily accepted until the purpose of the decree has been substantially effectuated, or when time and experience demonstrate that the decree 'is not properly adapted to accomplishing its purposes.'") (citation omitted).

But the Government offers no such proof, because it does not even attempt to analyze the actual, real-world impacts that termination of the Decrees may cause. That stands in marked contrast to the approach that the Second Circuit approved in *Kodak*, where "the district court required [the moving party] to prove that: (1) it no longer possesses market power over [the

---

[8]     As noted in *United States v. SBC Comms., Inc.*, 489 F. Supp. 2d 1, 13 (D.D.C. 2007), the *ABA* opinion was superseded on other grounds by 2004 amendments to 15 U.S.C. § 16. However, the Government continues to cite to *ABA* as authoritative on the definition of "determinative documents." *See* U.S. Dep't of Justice, Antitrust Div. Manual IV-51 (5th Ed. Mar. 2014), https://www.justice.gov/atr/file/761166/download.

relevant market], and therefore the primary purposes of the decrees—the elimination of monopoly and restrictive trade practices—have been achieved; and (2) termination of the consent decrees would benefit consumers." 63 F.3d at 102.[9]

The Motion does not address either of those points with any substance. Indeed, the Government does not even define the relevant market (or markets) with any system or rigor, and its only explicit discussion of the Defendants' market power is relegated to a footnote. *See* Motion at 24 & n.21. In that footnote, the Government cites a number of cases for general antitrust principles, but no case (and certainly no evidence) that addresses the realities of the film exhibition industry today. *See id.* (declaring, without support, that "[n]one of the Defendants currently has a market share that evidences market power"). And although the Motion (at 18-21) sketches out some high-level differences in the economics of Hollywood then and now, that cursory discussion contains no analysis at all on whether those changes will make block booking (as opposed to other restricted activities) more or less likely.[10]

Nor does the Government address *Kodak*'s second point by attempting to show that "termination of the consent decrees would benefit consumers." *See Kodak*, 63 F.3d at 102. At most, the Government simply argues that antitrust law has changed, so that vertical restraints are no longer subject to a *per se* ban, but are instead analyzed under the "fact-based rule of reason." *See* Motion at 22; *see generally id.* at 22-26. Importantly, the Government does not even contend

---

[9]     In some cases, such as *IBM*, a comprehensive market analysis may not be required because an investigation into other elements of the substantive antitrust claim can more efficiently disprove that termination would negatively impact the public interest. But as noted above in Section II.A., *IBM* does not stand for the proposition that argument alone (without evidence and findings of fact) is enough, and does not support the Government's cursory approach to the analysis in this case.

[10]     The Government's discussion of changed industry circumstances, Motion at 18-21, concerns issues such as vertical integration, circuit dealing, unreasonable clearances, and resale price maintenance—*i.e.*, parts of the Decrees addressing practices that are *distinct* from block booking.

that the rule-of-reason analysis *will* find that the restoration of the Decrees' proscribed practices benefits the public at large, only that it *may* do so. Instead, the Government removes the consumer and public from the equation entirely, dismissing their interests as dependent on "a factual question specific to a geographic market whether a *Paramount* Defendant's licensing terms illegally foreclosed competition in that geographic market." *Id.* at 24.

The problem for the Government is that it does not attempt to answer this "factual question" with any actual facts, including from any of the comments it received as part of the Decree review process. Instead, the remainder of its discussion relies on cherry-picked case law from different decades, districts, and even different industries to show that in *those* cases, and on *those* particular facts, the benefits of *those* challenged practices outweighed their expected harms. *See* Motion at 24-26. It is a complete *non sequitur* to leap from the highly contextual outcomes of the Government's patchwork of case law to the conclusion that if this Court allows what the Decrees currently forbid, then "termination will serve the 'public interest.'" *See IBM*, 163 F.3d at 738.[11] The fact that other conduct in any of those cases has survived rule-of-reason scrutiny tells us nothing about what will happen in this industry with these parties, and whether the negatives will outweigh the positives, if the Decrees are terminated. Those are the pertinent inquiries, and because the Government has not tried to answer them, it has not met its burden. *See Kodak*, 63 F.3d at 102.

---

[11] The same goes for the Government's assertion that "[a]bsent the Decrees, injured motion picture producers and theatres could sue under the Sherman Act and state antitrust statutes." *See* Motion at 27. That is cold comfort indeed: it does not serve the public interest to replace the Decrees (created and enforced through public funding, and publicly accessible) with a mottle of costly private antitrust suits that only bind the particular litigants in those cases, and may not even have visible results (due to confidential settlements). *See also* NATO Comment at 17-18 ("existing antitrust laws . . . are not sufficient on their own to protect competition in the face of potentially rapid change following any modification or repeal of the Decrees."). In any event, the question is not whether the public will lose all avenues to vindicate commercial rights if the Decrees are terminated, but whether the public will *benefit* from termination.

### III.   THE GOVERNMENT FAILED TO PROVE THAT A REPEAL ON BLOCK BOOKING IS IN THE PUBLIC INTEREST

As described above, the Government failed to meet its burden to prove that the repeal on the Decrees is in the public interest. This failure is egregiously apparent in the Government's discussion on block booking. Motion at 32-34. Notably, the Government's discussion of block booking does not mention the public interest or the impact on consumers *once*.

The Government pays lip service to the effects of the Decrees on smaller *distributors* but completely ignores the effects on smaller *exhibitors* and the communities they represent. The Government simply concludes that smaller distributors have "many other distribution platforms" they may take advantage of now, and there is therefore "little danger" that block booking could "foreclose independent movie distributors from sufficient access to the market." Motion at 33. This conclusion is in stark contrast with the facts. The Government failed to conduct even a cursory analysis into the real impact of block booking on the theatrical market in general and consumers specifically.

The Government has further failed to prove that the bounds of the Decrees have disadvantaged studio Defendants or stifled innovation. Indeed, the Government admits that large studios like Disney follow the restrictions of the Decrees despite not being expressly bound by the Decrees. Motion at 21. However, the Government suggests that this proves that the Decrees are no longer necessary when, in fact, it proves that the strength of the Decrees has a significant influence on the behavior of market participants. The booking patterns adopted by large distributors, as influenced by the Decrees, have allowed for "technological innovations, new competitors and business models" in film distribution while contributing to a theatrical market that has continued to break records alongside innovations in home distribution. Motion at 18; *see* Rebecca Rubin, *Global Box Office Hits New Record in 2019 With $42.5 Billion*, VARIETY (Jan. 10, 2020),

10

https://variety.com/2020/film/box-office/box-office-us-misses-record-disney-dominates-1203453 752/ (2019 highest ever global box office; domestic box office second-highest ever).

The Government agrees that block booking is integral to the "film-by-film license structure" that governs the industry. Motion at 34. Rather than engage with the facts, the Government proposes a two-year sunset to the block booking prohibition to "allow the Defendants and movie theatres to adjust their business plans" to help transition from the "disruption" the termination may cause. *Id*. This proposal itself is a tacit acknowledgement of the likely harms of introducing block booking into film licensing. However, this vague sunset period is not a true compromise, particularly for those exhibitors without the market share to change general licensing terms—the exact exhibitors most likely to be harmed by the repeal of the block booking provision of the Decrees. Instead, the sunset period is an attempt by the Government to avoid the thorny problem of demonstrating that a repeal on the block booking prohibition is in the public interest, which it cannot do. This "disruptive" change is not in the public interest and the prohibition on block booking should be maintained.

The ban on block booking contributes to a thriving theatrical ecosystem in large cities and small towns across the United States. The current ban on block booking has restrained defendants—who as a group control upwards of 50% of the market—from foreclosing competing distributors from an ability to compete, particularly in smaller markets.[12] Without this protection smaller distributors may be shut out of small theaters and markets, relegating their titles to larger urban markets or straight to the home, to the detriment of consumers. The preservation of this ecosystem serves the public interest.

---

[12]     According to data analyzed by comScore, Inc., the sum of the studio Defendants' market share from 2014-2019 ranged from 49.13% (2019) to 65.54% (2015), and the average share over the period was 59.31%.

### A.   The Ban on Block Booking Contributes to A Thriving Theatrical Exhibition and Distribution Market

The public interest is served by a diverse slate of films in theaters of all sizes. The Decrees ended the practice of block booking, which the Supreme Court described as "the practice of licensing, or offering for license, one feature or group of features on condition that the exhibitor will also license another feature or group of features released by the distributors during a given period." *United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 156 (1948). This in turn gave rise to the contemporary practice of licensing movies picture by picture and theater by theater. The constraints of the decrees allowed exhibitors freedom to program to the needs of their guests, which in turn has allowed for the success of smaller distributors and small town theater operators who require flexibility to target to their specific audiences. A return to block booking could upend decades of progress that has allowed consumers across the country the ability to see an incredibly wide variety of movies in their local cinemas.

The Government summarizes the evils of the pre-Decree ecosystem as licensing "patterns adopted by all distributors" that had the effect of shutting out "independent distributors from sufficient access" to the theatrical market. Motion at 17. However, as described in Section II.B. above, the Government provides no real facts to demonstrate the absence of likelihood of a similar harm absent the Decrees. This is after the Government received eighty-one comments outlining concerns over a repeal of the Decrees. Motion at 29. NATO's own comment offered a significant number of facts regarding the possible harms following a repeal of the prohibition on block booking. NATO Comment at 9-18. The Government chose not to engage with those facts, instead summarily dismissing all the comments for failing to respond to a deficient legal standard that the Government did not address in its call for comments.[13] Motion at 30.

---

[13]   The Government asked commenters to respond to six different specific questions, which

As described in NATO's comment, absent the prohibition on block booking, studios could require exhibitors to book their entire slate of films in wide release. If exhibitors were forced to book out the vast majority of their screens on major studio films for most of the year, this would leave little to no room for important films from smaller studios, including breakout hits from independent studios that brought big audiences in 2019, despite competing against big-budget tentpoles. These successes include *Parasite* ($22.3 million), *Peanut Butter Falcon* ($20.4 million), *Judy* ($24 million), and *The Farewell* ($17.7 million).   Dino Ray-Ramos, *Specialty Box Office 2019: Focus Features, A24, Roadside Attractions And Neon Lead Way*, Deadline (Jan. 3, 2020), https://deadline.com/2020/01/specialty-box-office-2019-winners-studios-top-movies-120281953 6. This problem would be exacerbated in those markets that have fewer screens per complex. Preserving the prohibition on block booking is vital to the ability of all distributors, both large and small, to bring their movies to the big screen and reap the benefits of a theatrical run. NATO Comment at 6-8.

---

did not include any thoughts on likelihood of identical future harm:

- Do the Paramount Decrees continue to serve important competitive purposes today? Why or why not?
- Individually, or collectively, are the decree provisions relating to (1) movie distributors owning movie theatres; (2) block booking; (3) circuit dealing; (4) resale price maintenance; and (5) overbroad clearances necessary to protect competition? Are any of these provisions ineffective in protecting competition or inefficient? Do any of these provisions inhibit competition or cause anticompetitive effects?
- What, if any, modifications to the Paramount Decrees would enhance competition and efficiency? What legal justifications would support such modifications, if any?
- What effect, if any, would the termination of the Paramount Decrees have on the distribution and exhibition of motion pictures?
- Have changes to the motion picture industry since the 1940s, including but not limited to, digital production and distribution, multiplex theatres, new distribution and movie viewing platforms render any of the Consent Decree provisions unnecessary?
- Are existing antitrust laws, including, the precedent of *United States v. Paramount*, and its progeny, sufficient or insufficient to protect competition in the motion picture industry?

*The Paramount Decrees*, U.S. Dep't of Justice, https://www.justice.gov/atr/paramount-decree-review (last updated Oct. 30, 2018).

As NATO further described, this review comes at an historic time in movie distribution. For the entire history of moviegoing, studios have had to pay a high transaction cost for the delivery of a movie to each theater, either via shipping costs of a film reel, or via a "virtual print fee" (VPF), meant to help subsidize the transition to digital cinema. NATO Comment at 8-9. This fee can be upwards of $2,000 per screen per title. *Id*. This fee has been a significant cost for studios, and has often been a meaningful barrier for independent distributors looking to expand a title's release. However, this cost has also kept the larger studios in check, as it would not make financial sense to "overbook" a title if the expanded theatrical footprint would not justify the VPF costs. *Id*.

However, the VPF contracts have already expired for many exhibitors, and are set to terminate completely in the next year or two. NATO Comment at 9. This means that the transaction costs for theatrical distribution are about to decrease by upwards of 90%. For smaller distributors, and for audiences across the country, this could lead to a golden age of independent film at a time where consumers are continuing to seek out midbudget titles in their theaters even as major studios shift their focus to tentpoles. *See* NATO Comment at 3-5. A repeal on the prohibition on block booking threatens small theaters and small distributors to the detriment of consumers.

**B.      The Prohibition on Block Booking Serves the Public Interest**

Block booking an entire studio's film slate fails to account for consumer tastes in many different regions, and would put small town and limited screen/non-multiplex exhibitors and their guests at a significant disadvantage. Many exhibitors in small towns are unable to play most R-rated movies or movies with certain themes because their customers find those characteristics offensive. Erich Schwartzel, *These 11 People Watch Every Movie, Especially the Gross Bits*, THE WALL ST. J. (June 2, 2017), https://www.wsj.com/articles/destroy-earth-just-dont-smoke-how-hollywood-decides-whats-acceptable-1496422644?mg=prod/com-wsj ("Callers [to the MPAA's Classification and Ratings Administration from the South in particular despise blasphemy . . . .

14

[Callers from] [t]he Midwest blanch[] at sex, especially in PG-13 movies. Residents of the coasts are concerned with violence.") These regional differences mean certain movies are dependent upon small town theaters for their success. Independent distributors such as faith-based distributors specifically sell to smaller markets "in flyover states who feel like mainstream Hollywood has left them behind" to target communities not fully served by the major studio releases. Joanna Rothkopf, *A Journey Into the Righteous, Risk-Averse World of Faith-Based Films*, JEZEBEL: THE MUSE (June 4, 2018), https://themuse.jezebel.com/a-journey-into-the-righteous-risk-averse-world-of-fait-1825210009 (faith-based distributors prefer a theatrical release as a means of "affecting the culture").

The Government's apparent belief that some film distribution can disappear from the theatrical space and reappear unchanged in the home market is a magic act that undermines the entire history of filmmaking and moviegoing. While it is true that there have long been movies made for the theater and those made for the home, it is also true that these films are fundamentally different both from a filmmaker's and audience's perspective.

For filmmakers, the immersive and communal aspect of watching a movie with strangers in a theater is at the core of their storytelling; it is *part of the movie*. Filmmakers of both tentpole and independent films have described why the theatrical experience is core to their craft, and have urged audiences to watch their movies in the theaters, as they intended. [14]

---

[14]     *See e.g., Waves Writer/Director/Producer Trey Edward Shults On Why The Theatrical vs. Streaming Debate Makes Him Want To 'Double Down' On Making Films For Cinemas*, CINEMABLEND (Nov. 13, 2019), https://www.cinemablend.com/news/2484695/waves-writerdirectorproducer-trey-edward-shults-on-why-the-theatrical-vs-streaming-debate-makes-him-want-to-double-down-on-making-films-for-cinemas ("For me, it's everything. **The movie was always meant to be a subjective, immersive experience and it doesn't get more immersive than in a cinema** . . . . **I pray that people see this in the theater**.") (emphasis added); Eric Kohn, *Christopher Nolan: I Won't Work With Netflix Because Their Film Strategy is 'Pointless'*, INDIEWIRE (July 19, 2017), https://www.indiewire.com/2017/07/christopher-nolan-interview-

Even filmmakers that felt obligated to forgo a traditional wide release by partnering with a streaming service expressed frustration that their audiences would largely be missing the key communal aspect they intended when making their films. Noah Baumbach, director of *The Marriage Story*, described the "communal experience of seeing something funny or sad" as an important reason to see a non-tentpole movie like his in the theaters. Ryan Lattanzio, *'Marriage Story' Director Noah Baumbach Stresses Value of Theatrical Experience and Praises 'E.T.'*, INDIEWIRE (Nov. 10, 2019), https://www.indiewire.com/2019/11/noah-baumbach-marriage-story-netflix-theatrical-experience-1202188566/. Similarly, Martin Scorcese, who worked with Netflix for *The Irishman*, described his belief that filmmakers like himself create movies for the big screen:

> **I don't know a single filmmaker who doesn't want to design films for the big screen, to be projected before audiences in theaters.**

---

dunkirk-netflix-1201857101 (Christopher Nolan, on whether he would work with a streamer: "No . . . Well, why would you? **If you make a theatrical film, it's to be played in theaters**.") (emphasis added); Zack Sharf, *Helen Mirren Speaks Out Against Netflix: 'It's Devastating for Film Directors'*, INDIEWIRE (Apr. 13, 2018), https://www.indiewire.com/2018/04/helen-mirren-netflix-devastating-film-directors-1201952316/ (Helen Mirren describing streaming platforms' practice of limited theatrical release as "devastating for . . . film directors, because **they want their movies to be watched in a cinema with a group of people** . . . . So **it's a communal thing**") (emphasis added); Jordan Peele (@JordanPeele), TWITTER (Mar. 2, 2017, 6:03 PM), https://twitter.com/jordanpeele/status/837483509216247808?lang=en (*Get Out* director Peele via Twitter: "Btw, 'Get Out' isn't a Redbox, Vod, itunes movie. **If you don't see it with the theater energy, you'll miss the full intended experience**.") (emphasis added); Mike Ryan, *Steve McQueen On 'Widows' And Why He Ignored A 'Warning' That An Actor Was 'Difficult' To Work With*, UPROXX (Sept. 11, 2018), https://uproxx.com/movies/steve-mcqueen-interview-widows-michelle-rodriguez/ ("That's the good thing about cinema. No point looking at a movie on your laptop on your own at home. The thrill of cinema is to be in an audience with 200 people, 500 people or a thousand people and watching something . . . . **It's a communal experience. That's what cinema is. And that's why I made this film**.") (emphasis added); Jessica Rawden, *Director Jon M. Chu Credits Movie Theaters For Crazy Rich Asians' Success*, CINEMABLEND (Apr. 5, 2019), https://www.cinemablend.com/news/2469893/director-jon-m-chu-credits-movie-theaters-for-crazy-rich-asians-success ("**We knew there was only one way to present our movie and that was theatrically**. No other medium in the world forces people to leave their homes make a choice to fight through traffic, stand in line, sit in a theater turn off the lights and say tell me the story with all my attention on the screen the way cinema does.") (emphasis added).

> That includes me, and I'm speaking as someone who just completed a
> picture for Netflix . . . . **Would I like the picture to play on more big
> screens for longer periods of time? Of course I would.**

Martin Scorsese, *Martin Scorsese: I Said Marvel Movies Aren't Cinema. Let Me Explain*, N.Y.

TIMES: OPINION (Nov. 4, 2019), https://www.nytimes.com/2019/11/04/opinion/martin-scorsese-

marvel.html (Cinematic art form is "an event created by the chemistry between the audience and

the picture itself") (emphasis added).

As the studio defendants continue to shrink their slates and focus on global tentpoles,

filmmakers and audiences looking for variety could lose out on the theatrical experience if studios

are able to demand that exhibitors devote all their screen space to the major studios alone. This

situation is particularly fraught for the small cinemas across the country that simply do not have

enough screens to accommodate onerous block booking requirements by the studios. According

to comScore, Inc., there are 2,592 cinema sites in the United States with four screens or fewer. Of

those, 1,278 are the only cinema in their town. Should studios be able to engage in block booking,

these theaters may be completely unable to program to the tastes of their communities, thus

"foreclose[ing] independent distributors from sufficient access to the first-run theatre market."

Motion at 17.

The Government seems unconcerned about the impact of this dramatic change on small

exhibitors, callously concluding that "[a]bsent the Decrees, some existing movie theatres or movie

distributors may thrive, while others may not." Motion at 38. However, the Government does

not—because it *cannot*—show that the closing of these theaters as a direct result of the repeal of

the Decrees is in the public interest. The Government's conclusions support its apparent belief that

the communal moviegoing experience—a cultural phenomenon preferred by filmmakers and

audiences—is something only those in larger cities should experience, and dismisses the need for the same experience in the 1,278 small towns with only one theater.

The real-world facts also demonstrate that consumers do not equate the home viewing experience as a suitable replacement for theatrical. Numerous studies have shown that those consumers at home streaming the most content *are in fact the most frequent moviegoers*. Ernst & Young, *The Relationship Between Movie Theatre Attendance and Streaming Behavior: Survey Insights* (Apr. 24, 2018), https://www.natoonline.org/wp-content/uploads/2018/04/Ernst-Young-Survey-Analysis-4-24-2018.pdf. Indeed, of the increasing number of consumers viewing content online, only 6% of the content viewed was movies, compared to 94% television shows. Motion Picture Association of America, 2018 Theme Report, 36 (2018), https://www.motionpictures.org/wp-content/uploads/2019/03/MPAA-THEME-Report-2018.pdf. As consumers shift from physical disc rentals/purchases to subscription services, the movie theater may be the last place where a consumer can go to purchase the specific title they want. That is, in a streaming ecosystem consumers pay for *access*; in a movie theater consumers pay for a *movie*.

The shared moviegoing experience directly serves the public interest. This importance is magnified for the small towns and small distributors the Government dismisses. A 2018 survey of some 22,500 moviegoers found that 65% of them considered their local art house theater valuable to their overall quality of life.  Art House Convergence, *AHC National Audience Study 2018*, 5 (Jan. 22, 2018), https://www.arthouseconvergence.org/wp-content/uploads/2019/05/AHC-2018-National-Audience-Study-FINAL-REPORT.pdf.  In part, this is because the moviegoing experience is an act of "collective spectatorship." Emily Flynn, *Discovering Audience Motivations Behind Movie Theater Attendance*, 9(2) Elon J. of Undergraduate Res. in Commc'ns 94, 96-97 (Fall 2018) (summarizing collective spectatorship scholarship). In this way, "movie theaters . . .

elicit a sense of community that people want to experience whether they realize it or not" in a way that in-home viewing simply cannot. *Id*. at 101.

A sense of community is not only a consumer desire—it is a necessity. Studies consistently link isolation as a key indicator for depression and early mortality. *See, e.g.*, Amy Novotney, *Social Isolation: It Could Kill You*, 50(2) Am. Psychol. Ass'n 34, (May 20, 2019). Moviegoing is consistently the lowest cost option for out of home entertainment, making it one of the nation's most affordable ways to find a community experience. Motion Picture Association of America, 2018 Theme Report, 16 (movie tickets "most affordable option" for out-of-home entertainment compared to theme parks, sporting events).

Consumers are showing up at movie theaters to see diverse titles, despite the Government's unsupported contention that distributors are "less reliant on theatrical distribution." Motion at 19. With widespread technology lowering the barrier to entry for filmmaking, art house theaters are seeing a boom in content and audience. Miriam Kreinin Souccar, *The Indie-Film Boom is Fueling a Rise in Art-House Theaters*, CRAIN'S NEW YORK BUSINESS (Sept. 25, 2017), https://www.crainsnewyork.com/article/20170925/ENTERTAINMENT/170929944/the-indie-film-boom-is-fueling-a-rise-in-art-house-theaters. Yet, these are the exact type of movies that the Government alleges could simply shift to "various non-theatrical aftermarkets." Motion at 19. However, transactional spend in the home has actually declined significantly from its peak of $24.7 billion in 2004 to $9.3 billion in 2019.  Thomas K. Arnold, *Digital Lifted Consumer Home Entertainment Spending to Record Heights in 2019*, MEDIAPLAYNEWS (Jan. 13, 2020), https://www.mediaplaynews.com/digital-lifted-consumer-home-entertainment-spending-to-record-heights-2019/ (subscription rather than transactional responsible for 63% of the home entertainment market). The facts clearly show that *despite the proliferation and collapse of non-*

*theatrical platforms, theatrical exhibition remains the jewel of the film market both in terms of revenue and creative intent.* Ensuring a diverse slate across the country benefits consumers. The ban on block booking serves the public interest.

## IV.    CONCLUSION

The Government misstates the appropriate standard of review for termination of a consent decree and accordingly, the Government has failed to prove that the repeal of the Decrees, and particularly the prohibition on block booking, is in the public interest. Rather, as demonstrated above, the ban on block booking serves the public interest by ensuring a wide variety of content in theaters of all sizes across the country. This diversity is what filmmakers and audiences want. Accordingly, at minimum, the ban on block booking should remain in effect.

Dated:  January 17, 2020                              Respectfully submitted,

**SEIFERT LAW FIRM**                                   **THE NATIONAL ASSOCIATION OF THEATRE OWNERS**

/s/ Mark J. Seifert                                    /s/ Jacqueline E. Brenneman*

Mark J. Seifert (*pro hac vice*)                       Jacqueline E. Brenneman (*pro hac vice*)
50 California Street, Suite 1500                        3450 Cahuenga Blvd. W, Suite 410
San Francisco, California 94111                         Los Angeles, California 90068
Telephone: (415) 999-0901                               Telephone: (818) 506-1778
Facsimile: (415) 901-1123                               Email:  jeb@natoca.com
Email:  mseifert@seifertfirm.com

*Attorney for Amicus Curiae*                            *General Counsel*
*The National Association of*                           *The National Association of*
*Theatre Owners*                                        *Theatre Owners*

*Electronic signature used with consent in accordance with Rule 8.5(b) of the Court's ECF Rules and Instructions.