IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) |
| v. | ) Case No. 1:19-mc-00544-AT |
| PARAMOUNT PICTURES, INC., | ) |
| Defendant. | ) |
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) |
| v. | ) |
| LOEW'S INCORPORATED, ET AL., | ) |
| Defendants. | ) |

**MEMORANDUM OF THE UNITED STATES IN REPLY TO *AMICUS CURIAE* MEMORANDA OF THE INDEPENDENT CINEMA ALLIANCE AND THE NATIONAL ASSOCIATION OF THEATRE OWNERS**

## I.   Introduction

The United States' Motion to Terminate the *Paramount* Decrees presents one substantive question: whether terminating the Decrees is in the public interest. In making that public interest determination, courts consider the elements of the violation underlying the decree. If one of those elements is shown to be unlikely to recur, then termination is in the public interest.

Here, the United States has concluded that termination is appropriate because (1) the Decrees long ago successfully dismantled and ended defendants' illegal industry-wide horizontal

collusion; (2) significant undisputed changes in the motion picture industry over the last 70 years as well as current antitrust law make it unlikely that the defendants would again illegally collude on an industry-wide basis; and (3) the Decrees' continued existence is no longer necessary to protect competition.

NATO asserts that the key question is whether termination benefits the public interest, not whether the specific conduct underlying the decrees will recur.  Brief of *Amicus Curiae* The National Association of Theatre Owners Regarding Plaintiff's Motion to Terminate (ECF No. 45, "NATO Br.") at 2.  NATO (and ICA) also asserts that the public interest standard requires an evidentiary showing that termination will not result in harm to non-parties, and that the United States has shifted this burden to non-parties. NATO Br. at 4-7, *Amicus Curiae* Independent Cinema Alliance's Memorandum in Opposition to the Department of Justice's Motion to Terminate the Paramount Decrees (ECF No. 41, "ICA Br.") at 4-5.  NATO and ICA misconstrue both the public interest standard and what is required to meet that standard.  They erroneously rely on contested decree termination proceedings involving violations of a different provision of the Sherman Act.  The antitrust laws are intended to protect competition, not competitors.  *See, e.g., Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977).  Mere speculation that some of NATO's and ICA's members may not survive in a competitive market unfettered by seventy-year-old consent decrees is not an inquiry the public interest standard countenances.[1]

---

[1] With respect to this Motion, the United States is the representative of the public interest, not theatre trade groups or the theatres themselves.  *See United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 176-177 (1948) (dismissing intervention by theatre associations and independent theatres).

## II. Argument

### A. NATO and ICA Misconstrue the Applicable Standard for Termination

#### 1. The United States has provided a reasonable basis for concluding that the underlying violation is unlikely to recur, and termination is in the public interest

This Court's role is to conduct a limited review to ensure that the government's judgment when moving to terminate is reasonable and that there is no showing of government bad faith or malfeasance. *See, e.g.*, *Sam Fox Publishing Co. v. United States,* 366 U.S. 683 (1961). Indeed, this Court previously recognized its deferential role as it applied to the termination of a *Paramount* Decree:

> 'Absent a showing of corrupt failure of the government to discharge its duty, the Court, in making its public interest finding, should . . . carefully consider the explanations of the government . . . and its responses to comments in order to determine whether those explanations are reasonable under the circumstances. . . . This Court may not substitute its opinion or views concerning the prosecution of alleged violations of the antitrust laws or the determination of appropriate injunctive relief for the settlement of such cases absent proof of an abuse of discretion.' . . . The same role is appropriate when the government consents to the termination of a decree.

*United States v. Loew's Inc.*, 783 F. Supp. 211, 214 (S.D.N.Y. 1992) (internal citations omitted). *See also United States v. Columbia Artists Management, Inc.*, 662 F. Supp. 865, 870 (S.D.N.Y. 1987) (deferring to government's judgment that perpetual consent decree no longer served the public interest); *United States v. Alex. Brown & Sons, Inc*., 963 F. Supp. 235, 238 (S.D.N.Y.1997) (the court's role in making the public interest determination is "limited").

NATO erroneously argues that the United States' position on deference conflicts with *United States v. American Cyanamid Co.,* 719 F.2d 558 (2d Cir. 1983). *See* NATO Br. 2-3. In *American Cyanamid*, the Second Circuit faulted the district court for deferring to the judgment of the Department of Justice where neither the government nor the district court had addressed "the

3

current state of the law as prescribed by the Supreme Court, which circuit and district courts are bound to follow." *American Cyanamid*, 719 F.2d at 567. *American Cyanamid* cannot be read as rejecting deference to the United States when there is no continuing controversy between the United States and the defendants, and where (unlike in *American Cyanamid*) the United States has thoroughly analyzed the public interest in light of the governing legal standard.

### 2. NATO and ICA fail to distinguish between consent decrees involving concerted conduct like that here and unilateral conduct

NATO and ICA wrongly rely on unilateral conduct cases to support their argument that the government needs to submit to this Court a comprehensive market analysis. *See* NATO Br. at 4-9 (citing *American Cyanamid,* 719 F.2d 558 (decree's purpose was to curb monopolization of the melamine market); *United States v. Int'l Bus. Machs. Corp.*, 163 F.3d 737 (2d Cir. 1998) (decree's purpose was to curb IBM's "monopolistic market power" to force consumers to buy other products); *United States v. Eastman Kodak Co.*, 63 F.3d 95 (decrees' purpose was to eliminate Kodak's monopoly and exclusionary practices)). The fundamental purpose of the consent decrees in these cases, unlike the current *Paramount* Decrees, was to remedy the antitrust harm arising from the underlying monopolies and unilateral conduct. A market analysis was appropriate in order to determine whether defendants still possessed market power in a defined antitrust market, an essential element of the underlying violations.

The crux of the *Paramount* case, however, was a horizontal agreement to collectively impose a series of restraints on competition. *See Loew's*, 783 F. Supp. at 212 ("[t]he proof at trial . . . established a horizontal conspiracy"). The offenses, as alleged in the complaint, were "combining and conspiring [1] unreasonably to restrain trade and commerce in the production, distribution and exhibition of motion pictures and [2] to monopolize such trade and commerce in

violation of the Sherman Act." *United States v. Paramount Pictures, Inc.*, 66 F. Supp. 323, 330 (S.D.N.Y. 1946), *aff'd in part*, *rev'd in part*, 334 U.S. 131 (1948).  An essential element of both a conspiracy in restraint of trade, in violation of Section 1, and a conspiracy to monopolize, in violation of Section 2, is concerted action.  If "one element necessary to such a violation [i]s not present," *IBM*, 163 F.3d at 738, termination is appropriate.

### 3. A defendant's unilateral imposition of vertical licensing restraints is irrelevant to whether defendants would engage in collusion following termination

NATO argues that the government does not even attempt to answer the "factual question" of whether an individual defendant's unilateral decision to impose a currently-banned licensing term would harm competition.  NATO Br. at 9.  NATO and ICA argue for a standard of review, unsupported by any precedent, whereby a consent decree cannot be terminated unless the government or defendants can prove that no anticompetitive effect will result from the termination.  Such certainty is neither possible nor required under the law.  *See, e.g., IBM*, 163 F.3d at 742.

In reaching its public interest determination, the United States was required to, and did, assess the probability that, absent the decrees, defendants would horizontally collude to impose the same licensing terms on the market.  Whether the unilateral imposition of block booking or other banned licensing restriction on any particular theatre would result in anticompetitive harm is irrelevant to the public interest analysis.

Absent the Decrees, each defendant may make a unilateral decision to employ block booking or other licensing restriction in a particular market, small or large.  They each unilaterally may do that now with respect to licensing restrictions that are not banned by the Decrees. Followed to its logical extreme, NATO's argument would require that licensing restrictions such

as block booking are forever banned, but only for the *Paramount* defendants and only in the motion picture industry.  There is nothing in the Decrees' banned vertical licensing practices that would or should be declared forever illegal with respect to every film in every market even when the licensing practice does not flow from a conspiracy among competitors.

Moreover, a *per se* ban on licensing restrictions may and likely would have the unintended and unforeseen consequence of limiting an individual defendant's ability to engage in procompetitive activities that benefit consumers.  Lifting these licensing restrictions may incent and enhance competition among theatres to provide better products and movie experiences to consumers.  As discussed in the United States' Memorandum, in the more than seventy years since the entry of the *Paramount* Decrees, courts analyzing vertical restrictions (including vertical non-price and resale price licensing restraints that the Decrees prohibit) have found those restrictions to be on balance procompetitive or competitively neutral.[2]

Innovation and change are the lifeblood of the competitive process.  Preventing procompetitive practices in perpetuity can lead to consumer harm.  This is why the Antitrust Division in 1979 established a policy that future consent decrees would automatically terminate after no more than ten years.  The 1979 change was based on the government's policy and enforcement judgment that perpetual decrees, like the *Paramount* Decrees, are not in the public interest.[3]

---

[2] In general, and as analyzed in the United States' Memorandum (ECF No. 4), the type of vertical licensing restrictions contained in the Decrees, while potentially restricting intrabrand competition, can be procompetitive because they incent and encourage interbrand competition, and it is interbrand competition that is the primary concern of the antitrust laws.  As the Second Circuit has found, "[r]estrictions on intrabrand competition can actually enhance market-wide competition by fostering vertical efficiency and maintaining the desired quality of a product." *K.M.B Warehouse Distribs. v. Walker Mfg. Co.*, 61 F.3d 123, 127-28 (2d Cir. 1995).  Terminating the Decrees could enhance, incent and encourage competition among movie distributors and also among theatres.

[3] Among other things, because of the remedies available under current antitrust statutes, including more robust and

### B. The Undisputed Facts and the Case Record Establish that the Industry is Significantly Changed

NATO and the ICA also argue that the government has not met its burden of proving that changed circumstances warrant terminating the Decrees. NATO Br. at 7; ICA Br. at 11. NATO and ICA, however, do not dispute, and it is a matter of common record, that today's motion picture industry is significantly different than the motion picture industry of the 1930s and 40s. Today, not a single one of the defendants, or any movie distributor, own a significant number of theatres; films no longer are released in sequential runs; and there are various post-theatrical markets that did not exist in the 1940s, including cable television, Internet streaming, video-on-demand, DVDs and Blu-Rays. All of these undisputed facts informed the United States' public interest determination that the motion picture industry is less prone to potentially anticompetitive collusive conduct today than it was in the 1930s and 40s when the conduct underlying the Decrees occurred.

Indeed, over thirty years ago in the last published *Paramount* Decree decision, this Court reached the same conclusion. It concurred in the government's conclusion that the changes that had occurred since the 1950s (new competitors, use of wide-release patterns, development of multiplexes, and new forms of post-theatrical exhibition, such as videocassettes and cable television), made the Decree restrictions "less relevant to today's market." *Loew's*, 783 F. Supp. at 214. Those changes coupled with the fact that the motion picture industry was fully subject to the general antitrust laws (as it is today), and that the Decrees likely prohibited procompetitive

---

far harsher penalties than those that existed in the 1950s when the Paramount Decrees were entered, the government concluded that current antitrust penalties provide far greater deterrence to resumption of the anticompetitive conduct that underlies consent decrees than would the threat of prosecution for criminal contempt of the decrees.

behavior (as they likely do today), led this Court to conclude that termination was in the public interest. *Id.* This same reasoning applies to the United States' public interest determination here.[4]

### C. The Antitrust Laws Protect Competition Not Classes of Competitors

In reaching its public interest determination, the United States followed the long-standing axiom that the antitrust laws protect competition not competitors. *See Brunswick Corp.*, 429 U.S. at 488. Although NATO's and ICA's members may prefer that the Decrees remain in effect to protect them from market forces, the antitrust laws are not designed to "curb all concentration of economic power," *IBM,* 163 F.3d at 741, or "'to protect businesses from the working of the market.'" *Id.* at 741-42 (quoting *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 558, 458 (1993)). Their purpose is to protect the public from "'the failure of the market.'" *Id*. The goal of public antitrust enforcement is not to benefit or protect particular classes of competitors, large or small, or dictate which technologies or companies, old or new, should succeed in the marketplace. NATO and ICA members' fears that they may have to compete more aggressively if the Decrees' perpetual vertical restrictions are lifted does not provide a legitimate basis for retaining these 70-year old Decrees.

### III.   Conclusion

For the reasons set forth above and in the United States' Memorandum, this Court should find that terminating the *Paramount* Decrees is in the public interest and the United States respectfully requests that the proposed order attached to the United States' Memorandum be entered at this

---

[4] Contrary to NATO's and ICA's assertions, the United States did investigate whether termination of the *Paramount* Decrees was in the public interest. The investigation included a 60-day public comment period, an analysis of the received public comments, and interviews and meetings with industry participants. The United States' Memorandum contains its responses to the public comments. In addition, the Division has undertaken significant antitrust investigations of the motion picture industry in the past few years, including the motion picture distribution and movie theatre markets. The Division has found no basis for concluding that the defendants are colluding in violation of the antitrust laws. Based upon the record, the United States concludes that terminating the Decrees is in the public interest.

time without further proceedings.

Dated:  January 31, 2020                                    Respectfully submitted,


FOR THE PLAINTIFF UNITED STATES OF AMERICA:


| */s*_____ | */s/*_____ |

/s/_____              /s/_____
Makan Delrahim                                       Yvette F. Tarlov
Assistant Attorney General                     Assistant Chief, Media, Entertainment & Professional
United States Department of Justice       Services Section
Antitrust Division                                      United States Department of Justice
950 Pennsylvania Avenue, NW             450 Fifth Street, N.W., Suite 4000
Washington, DC 20530                           Washington, DC  20530
                                                                  Telephone: (202) 514-5808
                                                                  Facsimile: (202) 514-7308
                                                                  E-mail: Yvette.Tarlov@usdoj.gov