```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
UNITED STATES OF AMERICA,

                        Plaintiff,

        -against-

PARAMOUNT PICTURES, INC.,

                        Defendant.

UNITED STATES OF AMERICA,

                        Plaintiff,

        -against-

LOEW'S INCORPORATED, ET AL.,

                        Defendants.
```

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _8/7/2020_

19 Misc. 544 (AT)

**ORDER**

ANALISA TORRES, District Judge:

This antitrust action concerns consent decrees known as the *Paramount* Decrees (the "Decrees"), which ended the motion picture horizontal distributor cartel of the 1930s and 40s and have regulated aspects of the movie industry for the last seventy years.[1] The Antitrust Division of the United States Department of Justice moves to terminate the Decrees effective immediately, except for a two-year sunset period on the Decrees' provisions banning block booking and circuit dealing. *See* Gov't Mot. at 2, ECF No. 1; Gov't Mem. at 2, ECF No. 2. *Amici curiae,* the Independent Cinema Alliance ("ICA") and the National Association of Theatre

---

[1] *See United States v. Paramount Pictures, Inc.*, Equity No. 87-273, 1948-49 Trade Cas. (CCH) ¶ 62,377 (S.D.N.Y. Mar. 3, 1949) (Paramount Pictures, Inc.); 1950-51 Trade Cas. (CCH) ¶ 62,861 (S.D.N.Y. June 7, 1951) (Twentieth Century Fox Film Corp.); 1950-51 Trade Cas. (CCH) ¶ 62,573 (S.D.N.Y. Feb. 8, 1950) (Columbia Pictures Corp., Universal Corp., and United Artists Corp.); 1950-51 Trade Cas. (CCH) ¶ 62,765 (S.D.N.Y. Jan. 4, 1951) (Warner Brothers Pictures, Inc.); and 1952-53 Trade Cas. (CCH) ¶ 67,228 (S.D.N.Y. Feb. 7, 1952) (Loew's Inc.); *see also* ECF No. 2-1 for copies of these Final Consent Judgments.

Owners ("NATO") oppose the motion. *See* ICA Opp., ECF No. 41; NATO Opp., ECF No. 45. For the reasons stated below, the Government's motion is GRANTED.

## BACKGROUND

In 1938, the Department of Justice brought an antitrust action against eight companies—Paramount Pictures, Inc. ("Paramount"), Twentieth Century Fox Film Corp. ("Fox"), Warner Brothers Pictures, Inc. ("Warner"), Loew's Incorporated ("Loew's"), Radio-Keith-Orpheum ("RKO"), Universal Corp. ("Universal"), Columbia Pictures Corp. ("Columbia), and United Artists Corp. ("United Artists") (collectively, "Defendants")—that, at the time, dominated the production and distribution of motion pictures in the United States. *See United States v. Paramount Pictures*, 334 U.S. 131, 140 (1948); *see also United States v. Loew's Inc.*, 783 F. Supp. 211, 212 (S.D.N.Y. 1992). The companies fell into two groups: (1) those that produced, distributed, and exhibited movies and (2) those that produced or distributed films, but did not exhibit them. *See Paramount*, 334 U.S. at 140; *see also* Gov't Mem. at 6–7.

Five of the Defendants, Paramount, Loew's, Warner, RKO, and Fox (collectively, the "Major Defendants") owned large movie theater circuits, including over seventy percent of the best and largest "first-run" theaters in the ninety-two largest cities in the United States. *Paramount*, 334 U.S. at 167. This market structure eventually led to cooperation and collusion, wherein Defendants established a cartel for the purposes of (1) limiting the first run of their pictures, as much as possible, to the theaters that the Major Defendants owned and controlled; and (2) closing off first-run theaters to their competitors, independent motion picture distributors. *Id.* at 154–55. In other words, Defendants created an intricate system of sequential and non-overlapping theatrical "runs" for their films. Gov't Mem. at 8–9. Pursuant to that scheme, Defendants classified all movie theaters into specific "run" categories. *Id.*; *see also Paramount*,

334 U.S. at 144 n.6  The first run was exclusively reserved what were then called first-run theaters.  Gov't Mem. at 8–9.  This was the highest priced and most profitable "run" because most moviegoers saw movies within a few weeks of release.  *Id.*  Defendants agreed to designate almost all of the theaters that Major Defendants owned and controlled as first-run.  *Id.* at 9.  After the first run ended, Defendants distributed their movies to discount-priced theaters in the second-run market, and after the second run, to a more-discounted third, fourth, or later theatrical run.  *Id.*  Defendants agreed to relegate most independent theaters to the later and less profitable runs.  *Id.*

At trial, the district court found that Defendants had (1) monopoly power in the distribution market for first-run motion pictures; and (2) engaged in a conspiracy to fix licensing practices, including admission prices, run categories, and "clearances" for substantially all theaters located in the United States.  *Paramount*, 334 U.S. at 170–71; *United States v. Paramount Pictures*, 85 F. Supp. 881, 884, 896 (S.D.N.Y. 1949) ("[W]e have found that a conspiracy has been maintained through price fixing, runs and clearances, induced by vertical integration," and that "this conspiracy resulted in the exercise of monopoly power"); *see also Loew's Inc.*, 783 F. Supp. at 212 ("The proof at trial established that the five [Major Defendants] had, *inter alia*, engaged in a 'horizontal' conspiracy to monopolize the exhibition business by foreclosing independent exhibitors from access to first-run films, and the [other Defendants] acquiesced in that scheme.").

The Supreme Court affirmed the district court's finding that Defendants were liable under the Sherman Act, and remanded the matter to the district court to fashion relief that would "uproot all parts of [the] illegal scheme—the valid as well as the invalid—in order to rid the

trade or commerce of all taint of the conspiracy" and undo "what the conspiracy achieved." *Paramount*, 334 U.S. at 148, 171; *see id.* at 141–61.

On remand, the United States and each Defendant entered into separate decrees, now known as the *Paramount* Decrees, to remedy the competitive harms. The Decrees required the Major Defendants to sell their theaters to new independent companies. *See* Gov't Mem. at 11. For the Major Defendants, the Decrees applied equally to the distribution companies and the new companies set up to own and operate each of their movie theater circuits. *Id.* The Warner, Fox, and Loew's decrees also prohibited their distribution companies from acquiring any theaters unless the district court found that such acquisitions would not unreasonably restrain competition. *Id.* Because they were entered earlier, the RKO and Paramount decrees did not contain that restriction. *Id.* RKO and Paramount, like Universal, Columbia, and United Artists, have always been free to acquire theaters without court approval. *Id.* at 11–12.

In addition to the theater divestiture requirements, the Decrees restricted the ways in which all Defendants could license and distribute movies to theaters. Specifically, the Decrees barred each Defendant from engaging in the following practices:

- Resale price maintenance – setting minimum movie ticket prices (section II, paragraph 1 and section III, paragraph 1 of the Warner decree);
- Unreasonable clearances – granting exclusive film licenses for overly broad geographic areas (section II, paragraphs 2, 3, and 4 and section III, paragraphs 2, 3, and 4 of the Warner decree);
- Block booking – bundling multiple films in one theatrical license (section II, paragraph 7 and section III, paragraph 7 of the Warner decree); and
- Circuit dealing – licensing a film to all theaters under common ownership or control instead of theater by theater (section II, paragraphs 6 and 8 and section III, paragraphs 6 and 8 of the Warner decree).

*Id.* at 12.

In 2018, the Antitrust Division announced an initiative to review, and where appropriate, terminate or modify "legacy antitrust judgments that no longer protect competition" because of

"changes in industry conditions, changes in economics, changes in law, or for other reasons." *See* U.S. Department of Justice Press Release, *Department of Justice Announces Initiative to Terminate "Legacy" Antitrust Judgments* (Apr. 25, 2018), https://www.justice.gov/opa/pr/department-justice-announces-initiative-terminate-legacy-antitrust-judgments.

The Government's review of the Decrees included a 60-day notice and public comment period. Gov't Mem. at 4–5. It received over eighty comments, many of which oppose termination of the Decrees. *Id.* at 5. The Government now moves to terminate the Decrees, effective immediately, and, in response to the comments received, proposes to add a two-year sunset period to the Decrees' block booking and circuit dealing provisions to provide a transition period to minimize market disruption. *Id.* at 5–6.

**DISCUSSION**

I.  Standard of Review

Under Rules 60(b)(5) and 60(b)(6) of the Federal Rules of Civil Procedure, on "motion and just terms, the court may relieve a party . . . from a final judgment [when] . . . applying it prospectively is no longer equitable; or any other reason that justifies relief." Fed. R. Civ. P. 60(b). Each of the Decrees provides that this Court retains jurisdiction to enable "any of the parties . . . and no others, to apply to the Court at any time for any such further order . . . as may be necessary or appropriate for the construction, modification, or carrying out of the same, . . . or for other or further relief." *See, e.g.*, Loew's Inc. Decree 1952-53 Trade Cas. (CCH) ¶ 67,228 (S.D.N.Y. Feb. 7, 1952) at Section X, ECF No. 2-1 at 74.

"Where, as here, the United States consents to the proposed termination of the judgment in a Government antitrust case, the issue before the Court is whether termination of the judgment

is 'in the public interest.'" *Loew's Inc.*, 783 F. Supp. at 213 (internal quotation marks and citations omitted) (terminating Decree in 1992 as to Loew's, on Government consent); *see also United States v. Int'l Bus. Machines Corp.*, 163 F.3d 737, 740 (2d Cir. 1998) ("By statute . . . the court may approve an antitrust consent decree only upon finding that it is 'in the public interest[.]'. Although the Tunney Act, by its terms, applies only to the approval of consent decrees, we have held that termination also requires judicial supervision—and 'consider[ation of] the public interest'—as a corollary to the Tunney Act." (quoting *United States v. Am. Cyanamid Co.*, 719 F.2d 558, 565 (2d Cir. 1983))).

The district court's "'public interest' determination must be based on the same analysis that it would use to evaluate the underlying violation." *United States v. Int'l Bus. Machines Corp.*, 163 F.3d 737, 740 (2d Cir. 1998). That evaluation "is necessarily forward-looking and probabilistic . . . focused on the likelihood of a potential future violation, rather than the mere possibility of a violation." *Id.* at 741–42.

"The Supreme Court has held that where the words 'public interest' appear in federal statutes designed to regulate public sector behavior, they 'take meaning from the purposes of the regulatory legislation.'" *Loew's Inc.*, 783 F. Supp. at 213 (quoting *NAACP v. FPC*, 425 U.S. 662, 669 (1976)). The antitrust laws, the "regulatory legislation" involved here, "were enacted for the protection of competition, not competitors." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977) (internal quotation marks and citation omitted); *see also United States v. Penn-Olin Chemical Co.*, 378 U.S. 158, 170 (1964).

"[T]he Department of Justice has broad discretion in controlling government antitrust litigation." *Loew's Inc.*, 783 F. Supp. at 214 (citing *Sam Fox Publishing Co. v. United States*, 366 U.S. 683, 689 (1961)). "[T]he Court, in making its public interest finding,

6

should . . . carefully consider the explanations of the government . . . and its responses to comments in order to determine whether those explanations are reasonable under the circumstances." *Id.* (citation omitted).

II. Analysis

A. Whether Termination is in the Public Interest

The Government has concluded that terminating the Decrees would be in the public interest for four reasons. First, the Decrees achieved the Supreme Court's remedial mandate to this Court: they "uproot[ed]" and ended Defendants' illegal conspiracy and, along with the passage of time, "rid" the industry of "all taint of the conspiracy," "undoing what the conspiracy achieved." *Paramount*, 334 U.S. at 148, 171; *see* Gov't Mem. at 16. Second, changes in the motion picture industry over the last seventy years have made it unlikely that the remaining Defendants could or would reinstate their cartel to monopolize the motion picture distribution and theater markets. *Id.* Third, antitrust case law has evolved to undermine the Decrees' ongoing regulatory provisions. *Id.* Although the Decrees bar vertical licensing practices as *per se* illegal, under current Supreme Court precedent, courts judge such conduct under the fact-specific "rule of reason" standard. *Id.* Finally, Defendants remain subject to liability under the antitrust laws. Absent the Decrees, the Sherman Act would continue to provide effective deterrence against any industry-wide attempts to re-establish a cartel to monopolize the film distribution and exhibition markets. *Id.*

The Court now assesses whether the Government "has offered a reasonable and persuasive explanation of why the termination of the [Decrees] . . . would serve the public interest in free and unfettered competition." *Loew's*, 783 F. Supp. at 214; *see also N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 4 (1958) ("The Sherman Act was designed to be a

comprehensive charter of economic liberty aimed at preserving free and unfettered competition as the rule of trade.").[2]

### 1. Necessity of the Decrees

The Government argues that, after seventy years, the Decrees are no longer necessary. The gravamen of the *Paramount* case was a long-standing horizontal conspiracy among Defendants to monopolize the first-run motion picture theater market. Critical to this illegal cartel was that (1) Defendants collectively had monopoly power in the distribution market for first-run films; and (2) the Major Defendants also owned the best "first-run" theaters in the most important geographic locations. This market structure led to collusion that foreclosed independent distributors from sufficient access to the first-run theater market.

The Decrees put an end to Defendants' collusion and cartel and, in their absence, the market long-ago reset to competitive conditions. Both the market structure and distribution system that facilitated that collusion are no longer the same. As the Court explains below, seventy years of technological innovation, new competitors and business models, and shifting consumer demand have fundamentally changed the industry. As another court in this district previously stated in granting a motion to terminate an antitrust judgment: "In view of the changed environment in which the [f]inal [j]udgment now operates, there is no persuasive reason for maintaining it and imposing upon the defendants a decree which no longer comports with the current state of the market." *United States v. Columbia Artists Mgmt., Inc.*, 662 F. Supp. 865, 870 (S.D.N.Y. 1987).

### 2. Changes to the Motion Picture Industry

In the seventy years since the Decrees were entered, the motion picture industry has seen significant changes. First, the Decrees forced the Major Defendants to separate their distribution

---

[2] The Tunney Act does not require a court to conduct an evidentiary hearing. 15 U.S.C. § 16(e)(2).

and theater operations; today, none of them own an appreciable percentage of the nation's movie theaters. Gov't Mem. at 18. In fact, no movie distributor owns a major theater. *Id.* Second, although the Decrees concerned first-run motion picture theater markets, films today are broadly released in single theatrical runs. *Id.* In the 1930s and 40s, the only way that the public could view a motion picture was in a single-screen movie theater. Multiplexes, broadcast and cable television, DVDs, and the internet did not exist. The singles-creen, theater-only distribution market provided Defendants with the incentive and ability to limit the first-run distribution of their films to a select group of owned or controlled theaters in order to maximize their profits, and to relegate independent theaters to subsequent less profitable runs. *Id.* at 18–19.

Today, subsequent theatrical runs, as well as subsequent-run theaters, no longer exist in any meaningful way. *Id.* at 19. Rather, major films are released broadly to thousands of multi-screen theaters at the same time in a single theatrical run. This material change in motion picture distribution was apparent in 1989, when the Second Circuit noted that, among other changes to this industry,

> the development of national television advertising . . . changed the business realities of the industry so that movie producers and distributors have every incentive to disseminate their products as quickly, and as widely, as possible. Many more exhibitors exhibit on many more screens than was the case when the consent judgments were entered into.

*United States v. Loew's Inc.*, 882 F.2d 29, 33 (2d Cir. 1989).

Moreover, as internet movie streaming services proliferate, film distributors have become less reliant on theatrical distribution. *See* Brooks Barnes, *The Streaming Era Has Finally Arrived. Everything Is About to Change*, New York Times (Nov. 18, 2019), https://www.nytimes.com/2019/11/18/business/media/streaming-hollywood-revolution.html (discussing the advent and rise of internet movie streaming services). For example, some

independent distributors, relying on subscription, instead of box office revenues, currently release movies to theaters with either limited theatrical runs or on the same day as internet movie streaming services. Netflix, which plans to release over fifty movies this year, "mostly bypasses theaters." Brooks Barnes, *Netflix's Movie Blitz Takes Aim at Hollywood's Heart*, New York Times (Dec. 16, 2018), https://www.nytimes.com/2018/12/16/business/media/netflix-movies-hollywood.html; *see* Gov't Mem. at 20.

The competitors have also changed since the advent of the Decrees. *Id.* at 20–21. Many of the original defendants are no longer in business, including the RKO film distribution company, and all of the Loew's, Paramount, RKO, Warner, and Fox theater companies that were created as a result of the Decrees' divestiture provisions. *Id.* Others distribute far fewer films. For example, MGM, one of the largest motion picture studios in the 1930s and 40s, distributed 52 movies in 1939, including *Gone with the Wind*, *The Wizard of Oz*, and *It's a Wonderful Life*, but only three films in 2018. *Id.*

Motion picture distributors that are not subject to the Decrees have entered the market since the 1940s—most significantly, The Walt Disney Company, the leading movie distributor in 2018 with about $3 billion in domestic box office revenues. *See id.* at 21. Other motion picture distributors not subject to the Decrees include Lionsgate (20 films released in 2018), Focus Features (13 films), Roadside Attractions (12 films), and STX Entertainment (10 films). *See id.* None of the internet streaming companies—Netflix, Amazon, Apple and others—that produce and distribute movies are subject to the Decrees. Thus, the remaining Defendants are subject to legal constraints that do not apply to their competitors.

*Amici* argue that although the Decrees apply only to Defendants, "the stakes of this deregulatory effort extend" beyond the specific Defendants in this case. NATO Reply at 14,

ECF No. 51; *see also* ICA Opp. at 12–13.  They contend that the "[c]onsent decrees serve as a yardstick of acceptable behavior, exerting a normative effect on industry actors who are not parties to them."  NATO Reply at 14.  But termination of the Decrees does not give Defendants, or other market participants, free rein to implement the same anti-competitive practices that the Decrees remedied.  Termination simply implies that this Court, in performing a "necessarily forward-looking and probabilistic" evaluation, determined that termination would be in the public interest because there is a low "likelihood of a potential future violation," *IBM*, 163 F.3d at 741–42, given the changes in the market and the fact that motion picture distributors not subject to the Decrees have shown no propensity to acquire major movie theater circuits or engage in the type of collusive practices the Decrees targeted, Gov't Mem. at 21.  If there is a future violation, however, that party would be subject to the liability under the full extent of federal and state antitrust laws, as they are today.

Given this changing marketplace, the Court finds that it is unlikely that the remaining Defendants would collude to once again limit their film distribution to a select group of theaters in the absence of the Decrees and, finds, therefore, that termination is in the public interest.

### 3. Changes in Antitrust Law

Changes in antitrust law also suggest that the potential for future violation is low.  The Decrees' treatment of certain conduct as *per se* illegal and subject to criminal penalties—no matter what the factual circumstances—prohibits conduct that today may be deemed legal and beneficial to competition and consumers.  For example, the Decrees outlawed vertical integration in order to end Defendants' horizontal conspiracy.  *Paramount*, 334 U.S. at 174; *Paramount*, 85 F. Supp. at 893.  Today, vertical integration would be reviewed under a different standard.  The Supreme Court has recognized that vertical integration can create efficiencies that lower costs

11

and encourage innovation that often results in better products and lower prices for consumers. *See, e.g.*, *Leegin Creative Leather Prod., Inc. v. PSKS, Inc.*, 551 U.S. 877 (2007). Under a fact-based "rule of reason" analysis, a court must weigh the competitive harm of foreclosing competitors—either motion picture distributors from theaters, or movie theaters from a movie distributor's films—against any procompetitive efficiencies to determine whether a transaction violates the antitrust laws. *See, e.g.*, *Loew's Inc.*, 882 F.2d at 33.

Statutory merger law also has changed significantly. At the time the Decrees were entered, companies could merge without any notification to the antitrust authorities. Today, the Hart-Scott-Rodino Antitrust Improvements Act of 1976 (the "HSR Act"), 15 U.S.C. § 18a, requires parties who engage in a significant merger transaction (*e.g.*, where the merger involves an acquisition of securities or assets valued over $90 million) to notify the federal antitrust agencies and permit them to investigate before their transaction can close. In the absence of the Decrees, there would still exist industry oversight because a merger between any major movie distributor and one of the large national theater circuits would very likely require HSR filings, thereby providing the antitrust agencies with notice and opportunity to evaluate the competitive effects of the transaction.

The legal framework used to evaluate the Decrees' film licensing practices—including block booking, circuit dealing, and resale price maintenance—has also changed. Although *per se* illegal seventy years ago, today, courts would analyze such restraints under the rule of reason—evaluating the specific market facts to determine whether a practice's anticompetitive harm outweighs its procompetitive benefits. *See, e.g.*, *Leegin*, 551 U.S. at 907 (extending rule of reason analysis to minimum resale price maintenance claims); *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 26–29 (1984) (holding that tying arrangements [like block booking] are

presumed to be *per se* illegal only in certain factual circumstances, including where the defendant had market power and where the tie foreclosed competitors from the tied market); *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 59 (1977) (holding that non-price vertical restraints are judged under rule of reason), *abrogated by Illinois Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006).

Lastly, maintaining the Decrees in perpetuity "would not be consistent with the current Department of Justice Antitrust Division policy of limiting consent judgments to a period of ten years." *Columbia Artists Mgmt., Inc.*, 662 F. Supp. at 866–67. Given the increased penalties that Congress has mandated for *per se* violations of the antitrust laws, the Antitrust Division concluded that a successful criminal prosecution under the Sherman Act would more effectively deter antitrust recidivists than a criminal contempt proceeding under provisions of a longstanding consent decree. *See id.*; *see also* Gov't Mem. at 4 n.6.

Because changes in antitrust law and administration have diminished the importance of the Decrees' restrictions, while still providing protections that will keep the probability of future violations low, the Court finds that termination of the Decrees is in the public interest.

    4. Antitrust Laws as an Effective Deterrence

Finally, the Government argues that although terminating the Decrees would release Defendants from the Decrees' restrictions, they would still be subject to liability under federal and state antitrust law. Gov't Mem. at 26–28. Absent the Decrees, any plaintiff, whether the United States or a private plaintiff, would still have the advantage of the Supreme Court's and this Court's rulings in the *Paramount* litigation that resulted in the Decrees. Antitrust laws, and their faithful enforcement, weigh in favor of the Court's finding that there is a low likelihood of a potential future violation absent the Decrees. *IBM*, 163 F.3d at 740.

B. Public Comments

Having concluded that the Government has "offered a reasonable and persuasive explanation" for why termination of the Decrees would "serve the public interest in free and unfettered competition," *Loew's Inc.*, 783 F. Supp. at 214, the Court turns to whether the comments received by the Government and the Court provide sufficient basis for denying the Government's motion, *see id.* The Court concludes that they do not.

The Government solicited public comments with regard to whether the Decrees should be terminated or modified. The comments focused on vertical integration in the motion picture industry and movie distribution and licensing practices. *See* Gov't Mem. at 29–38. The Government argues that the comments fail to establish that (1) there is a likelihood that the remaining *Paramount* Defendants would again collude to impose an anticompetitive distribution system or anticompetitive terms in their theatrical film licensing agreements, and (2) that current antitrust laws are inadequate to police any such collusion. *Id.* at 30.

With respect to vertical integration, commenters argued that terminating the ban on vertical integration would allow major movie studios to merge with one of the large national theater circuits—AMC, Cinemark, or Regal. *Id.* The Government notes, however, that the Decrees do not prohibit the vertical integration commenters warn about because vertical restrictions apply only to a subset of movie distributors; the Decrees do not apply to every distributor in the market and do not even apply to every Defendant. *See id.* at 31. Moreover, the Court finds that changes to antitrust administration, in particular, the HSR Act, provide federal antitrust agencies with notice and the opportunity to evaluate the competitive significance of any major transaction between a movie distributor and a theater circuit, which suggests a low likelihood of potential future violation. *IBM*, 163 F.3d at 741–42.

With respect to distribution and licensing practices, commentators, including *amici* ICA and NATO, argue that the restrictions on block booking and circuit dealing should be preserved. *See* Gov't Mem. at 32–36; NATO Opp. at 10–20. Block booking is the "the practice of licensing . . . one feature or a group of features on condition that the exhibitor will also license another feature or group of features," *Paramount*, 334 U.S. at 156, "tying" multiple films together in one theatrical license, instead of licensing films on a film-by-film basis, *see id.* at 158. Circuit dealing is the practice of licensing films to all movie theaters under common ownership, as opposed to licensing each film on a theater-by-theater basis. *Id.* at 153–57.

In the 1930s and 40s, Defendants required block booking provisions in many of their theatrical licenses and they often required first-run theaters to license their entire season's output of films. *United States v. Paramount Pictures*, 66 F. Supp. 323, 347 (S.D.N.Y. 1946), *aff'd in part, rev'd in part*, 334 U.S. 131(1948); *United States v. Paramount Pictures*, 70 F. Supp. 53, 63 (S.D.N.Y. 1946). Requiring a key group of marquee theaters to show all of Defendants' films—one after the other—tied them up for weeks or months, thus foreclosing independent distributors from the first-run theaters they needed to successfully launch and distribute their films. In today's landscape, although there may be some geographic areas with only a single one-screen theater, most markets have multiple movie theaters with multiple screens simultaneously showing multiple movies from multiple distributors. There also are many other movie distribution platforms, like television, the internet and DVDs, that did not exist in the 1930s and 40s. Given these significant changes in the market, there is less danger that a block booking licensing agreement would create a barrier to entry that would foreclose independent movie distributors from sufficient access to the market.

Market changes have also limited any dangers posed by the practice of circuit dealing. In

the 1930s and 40s, Defendants illegally agreed among themselves to use circuit deals to ensure that the first run of their films played in the theaters that the Major Defendants owned and controlled, thus foreclosing independent theaters from those films' first runs. *Paramount*, 70 F. Supp. at 63.  By doing so, Defendants used their collective market power in film distribution to gain a monopoly in the first-run theater market.  Because the Decrees ended the collusion and required the Major Defendants to separate their film distribution and theater operations, and the industry no longer uses sequential theatrical runs, it is unlikely that any collective attempt by Defendants to once again monopolize the theater market would or could reoccur.

The Government moves to terminate the Decrees immediately, but with a two-year sunset period for the Decrees' block booking and circuit dealing provisions which would provide movie theaters a transitional time period to adjust their business models and strategies to any proposals to change the film-by-film, theater-by-theater licensing regime.[3]  This sunset period responds to the concerns that the movie theaters raise in their public comments.

The Court concludes, therefore, that the Government has "offered a reasonable and persuasive explanation" for why the termination of the Decrees would "serve the public interest in free and unfettered competition." *Loew's Inc.*, 783 F. Supp. at 214.  The Government has addressed the public comments received by the Department of Justice, and the objections set forth in the *amicus briefs*, by including a two-year sunset period for the Decrees' block booking and circuit-dealing provisions.  Moreover, the Court concludes that these objections do not provide sufficient basis for denying the Government's motion.  *See id.* at 214.  That is not to say that any given merger between distributors and theaters, or any particular set of film licensing practices, would necessarily be lawful—only that the Government and courts have the tools to

---

[3] The Decrees' provisions relating to block booking and circuit dealing are set forth in each Decree in section II, paragraphs 6, 7, and 8, except for the Warner decree; and section III, paragraphs 6, 7, and 8 of the Warner decree. *See* Gov't Mem. at 2 n.2.

16

carefully assess potential threats to competition in the movie industry as they arise without the need to rely on these outdated court orders.

## CONCLUSION

For the reasons stated above, the Government's motion is GRANTED. The Decrees are terminated, effective immediately, except for a two-year sunset period on the Decrees' provisions banning block booking and circuit dealing.

The Clerk of Court is directed to terminate the motions at ECF Nos. 1 and 2 and close this case.

SO ORDERED.

Dated: August 7, 2020
       New York, New York

                                          ANALISA TORRES
                                    United States District Judge